IN THE SUPREME COURT OF NORTH CAROLINA

No. 206PA16

Filed 29 September 2017

DEPARTMENT OF TRANSPORTATION

v.

ADAMS OUTDOOR ADVERTISING OF CHARLOTTE LIMITED PARTNERSHIP

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 785 S.E.2d 151 (2016), reversing an order entered on 27 August 2014 by Judge Lisa C. Bell in Superior Court, Mecklenburg County. Heard in the Supreme Court on 21 March 2017.

*Joshua H. Stein, Attorney General, by Kenneth A. Sack, Assistant Attorney General, for plaintiff-appellee.*

*Van Winkle, Buck, Wall, Starnes and Davis, P.A., by Craig D. Justus, for defendant-appellant.*

MARTIN, Chief Justice.

In this appeal, we consider whether the Court of Appeals erred in reversing the trial court's order addressing the appropriate measure of damages in a condemnation action. The North Carolina Department of Transportation (DOT) condemned a leasehold interest held by Adams Outdoor Advertising of Charlotte Limited Partnership (Adams Outdoor). Adams Outdoor owned a billboard situated on the leasehold and rented out space on the billboard to advertisers. At the time of

the taking, the billboard did not conform to city or state regulations, but Adams Outdoor held permits that allowed for the billboard's continued use. We must address which Article of Chapter 136 of our General Statutes applies to this condemnation proceeding and which evidence is admissible to help the trier of fact determine the fair market value of Adams Outdoor's condemned leasehold interest. We affirm the decision of the Court of Appeals in part and reverse it in part.

## I. Background

Defendant Adams Outdoor is an outdoor advertising company that rents out advertising space on billboards. In October 2001, Adams Outdoor acquired a billboard at the corner of Sharon Amity Road and Independence Boulevard in Charlotte, North Carolina. Approximately 85,000 vehicles drove by this location each day. Adams Outdoor rented out advertising space on the billboard and collected payments from the advertisers.

The billboard, which was constructed in 1981, was 65 feet tall and had two back-to-back sign face displays of approximately 14 feet by 48 feet each, or 672 square feet of advertising space per face. The billboard weighed approximately 30,000 pounds, had a steel monopole support, and was attached to the land by a foundation that was dug 18 feet into the ground, 6 feet around, and backfilled with concrete. The billboard was a legal height when it was built, but by the time Adams Outdoor acquired it, it no longer conformed to revised DOT height regulations. Because the

billboard already existed when the regulations changed, Adams Outdoor received a permit that allowed it to continue to use the billboard even though it was nonconforming.

At the same time that it acquired the billboard, Adams Outdoor acquired the lease for the lot on which the billboard was located. When Adams Outdoor acquired the lease, the lease was operating on a year-to-year basis. In 2006, Adams Outdoor negotiated a new lease with the landowner. The new lease term started in August 2007 and ran for ten years, and the lease also provided that this term would be automatically extended for another ten years. After the automatically extended term, the parties had the option to let the lease continue to automatically renew for successive ten-year terms, but either party could decline to renew the lease with ninety days' notice before any given renewal. The lease permitted Adams Outdoor to use the lot for outdoor advertising purposes only and provided that Adams Outdoor could remove the billboard either before or within a reasonable time after the lease expired or was terminated. During the existence of the lease, Adams Outdoor, but not the landlord, could cancel the lease at any time if one of a small number of specific circumstances arose.

This lease was recorded in the Mecklenburg County Register of Deeds Office. While the recorded lease was in effect, the City of Charlotte also changed its regulations in a way that made the billboard nonconforming. As with the change in DOT's regulations, the billboard was grandfathered in as a nonconforming billboard,

and Adams Outdoor received a permit for its continued use.

Plaintiff DOT purchased the fee simple interest in the parcel of land on which Adams Outdoor's billboard stood. In December 2011, DOT filed a civil action and declaration of taking of Adams Outdoor's interest in the property "for public use in the construction of [a] . . . highway project." DOT hired an appraiser to estimate the value of the leasehold interest. To estimate this value, the appraiser used the "bonus value" approach, which compares the rent stipulated in the lease to the fair market rental value of that lease. The appraiser concluded that, because Adams Outdoor was paying a higher rent for this property than it paid in what the appraiser considered to be reasonably similar leases, the lease had negative value and just compensation was zero. Adams Outdoor did not agree with this assessment, and both parties moved for a section 108 hearing to determine the issues raised by the pleadings, including whether a taking had occurred and, if so, the extent of that taking; the proper classification of the billboard; the proper way to determine the amount of compensation due to Adams Outdoor; and whether certain evidence was admissible to help determine the fair market value of the leasehold interest.[1] The trial court granted these motions and held the section 108 hearing.

The trial court's findings of fact after the hearing included, among other things,

---

[1] The purpose of a section 108 hearing is to allow a judge to "hear and determine any and all issues raised by the pleadings other than the issue of damages." N.C.G.S. § 136-108 (2015).

that "[b]ecause of the nonconforming nature of the Billboard, and as a consequence of the highly restrictive requirements for new billboard locations, the Billboard could not be moved in its entirety and relocated"; that Adams Outdoor "earned substantial rental income from leasing space on the Billboard to advertisers"; that "[t]he Billboard and its outdoor advertising use is essentially self-operating as rental property for advertisers to display their messages to the intended viewing audience"; that "[b]ecause Adams possessed a valid State permit for the Billboard, neither the City of Charlotte nor any other local regulatory authority could require its removal by way of regulations . . . without paying just compensation"; and that "DOT's expert . . . was directed by the DOT to specifically exclude the value of the outdoor advertising in determining his opinion on just compensation."

The trial court then concluded that, "[b]ecause the DOT caused the removal of Adams' nonconforming outdoor advertising property interests . . . by way of condemnation, [Article 11 of Chapter 136] is applicable and controlling in setting the conditions of measuring just compensation." The trial court therefore ordered that the monies that DOT owed to Adams "must include the value of the outdoor advertising, taking into account the lease portfolio (including any reasonable expectation of renewal), the physical structure, and the accompanying permits." The trial court also concluded that DOT's bonus value method was "improper" and should be excluded.

DOT appealed, and the Court of Appeals reversed. *Dep't of Transp. v. Adams*

*Outdoor Advert. of Charlotte Ltd. P'ship*, ___ N.C. App. ___, ___, 785 S.E.2d 151, 161 (2016). The Court of Appeals determined that the controlling statutory framework was Article 9 rather than Article 11 of Chapter 136 of the North Carolina General Statutes. *Id.* at ___, 785 S.E.2d at 155. The Court of Appeals also held that the billboard was noncompensable personal property, and that the alleged loss of revenue from renting advertising space, the permits issued to defendant, and the option to renew the lease were not compensable property interests. *Id.* at ___, 785 S.E.2d at 157-60. Finally, the Court of Appeals reversed the trial court's order excluding bonus value method evidence because, it said, that part of the order was based on the "erroneous premise" that the billboard was "a permanent leasehold improvement" instead of personal property. *Id.* at ___, 785 S.E.2d at 160-61.

Adams Outdoor petitioned this Court for discretionary review, and we granted its petition. We must decide (1) whether the Court of Appeals erred in its conclusion that the fair market value provision in Article 9, not Article 11, governs this condemnation proceeding; (2) whether the value that the billboard added to that of the leasehold interest should be considered in determining the fair market value of that interest; (3) whether the income derived from renting out advertising space should be considered in determining the fair market value of the leasehold interest; (4) whether the fact that permits had been issued to Adams Outdoor for continued use of the billboard should be considered in determining the fair market value of the leasehold interest; (5) whether the automatic renewal of the lease and the options to

renew the lease should be considered in determining the fair market value of the leasehold interest; and (6) whether DOT's bonus value method evidence should be considered in determining the fair market value of the leasehold interest.

This Court reviews a trial court's findings of fact to determine whether they are supported by competent evidence and "whether the findings of fact support the conclusions of law." *State v. Biber*, 365 N.C. 162, 167-68, 712 S.E.2d 874, 878 (2011). This Court reviews conclusions of law de novo. *E.g., id.* at 168, 712 S.E.2d at 878. It also reviews questions of statutory interpretation de novo. *E.g.*, *Hammond v. Saini*, 367 N.C. 607, 609, 766 S.E.2d 590, 592 (2014).

## II. Analysis

### 1. The controlling statutory scheme

Using its power of eminent domain, the government may take private property for public use. *State v. Core Banks Club Props., Inc.*, 275 N.C. 328, 334, 167 S.E.2d 385, 388 (1969). When the State takes private property for public use, "the owner must be justly compensated." *Dep't of Transp. v. M.M. Fowler, Inc.*, 361 N.C. 1, 4, 637 S.E.2d 885, 889 (2006). The possessor of a recorded leasehold interest is likewise entitled to just compensation when the State takes that interest. *See Givens v. Sellars*, 273 N.C. 44, 50, 159 S.E.2d 530, 536 (1968) (citing 26 Am. Jur. 2d *Eminent Domain* § 79 (1966)); *see also* 26 Am. Jur. 2d *Eminent Domain* § 138 (2014) ("A leasehold may be classified as 'property' subject to the Takings Clause of the U.S.

Constitution's Fifth Amendment.").

Under the eminent domain power set forth in Article 2 of Chapter 136, DOT has the right to "acquire by gift, purchase, or otherwise . . . any road or highway, or tract of land or other property whatsoever that may be necessary for a State transportation system and adjacent utility rights-of-way." N.C.G.S. § 136-18(2)(e) (Supp. 2016). When DOT acquires property by condemnation, Article 9 of Chapter 136 sets out the appropriate measure of damages to which the owner of condemned property is entitled. *Id.* § 136-112(2) (2015). Under this Article, the measure of damages when DOT takes an entire tract of land is "the fair market value of the property at the time of taking." *Id.*

Under the eminent domain power set forth in Article 11 of Chapter 136, titled "Outdoor Advertising Control Act," DOT also has the power "to acquire by . . . condemnation all outdoor advertising and all property rights pertaining thereto which are prohibited under the provisions of G.S. 136-129, 136-129.1 or 136-129.2, provided such outdoor advertising is in lawful existence on the effective date of this Article." *Id.* § 136-131 (2015). Under Article 11, however, the measure of damages when the outdoor advertising owner does not own the underlying fee interest in the property is "limited to the fair market value . . . of the outdoor advertising owner's interest in the real property on which the outdoor advertising is located *and such value shall include the value of the outdoor advertising.*" *Id.* (emphasis added).

Adams Outdoor argues, and the trial court agreed, that compensation for the leasehold interest should be measured according to Article 11, not Article 9. If section 136-131 of Article 11 controls in this case, then the fair market value of the leasehold interest would necessarily include the value of the outdoor advertising.

In statutory interpretation, we first look at the statute's plain meaning. "When the language of a statute is plain and free from ambiguity, expressing a single, definite and sensible meaning, that meaning is conclusively presumed to be the meaning which the Legislature intended, and the statute must be interpreted accordingly." *State Highway Comm'n v. Hemphill*, 269 N.C. 535, 539, 153 S.E.2d 22, 26 (1967) (quoting *State ex rel. Long v. Smitherman*, 251 N.C. 682, 684, 111 S.E.2d 834, 836 (1960)); *accord Falk v. Fannie Mae*, 367 N.C. 594, 602, 766 S.E.2d 271, 277 (2014). Here, the statute gives DOT the power "to acquire by purchase, gift, or condemnation all outdoor advertising and all property rights pertaining thereto *which are prohibited under the provisions of G.S. 136-129, 136-129.1 or 136-129.2*." N.C.G.S. § 136-131 (emphasis added). These provisions all provide limitations on the construction or maintenance of an outdoor advertising device. *Id.* §§ 136-129, -129.1, -129.2 (2015). The explicit reason for enacting the Outdoor Advertising Control Act, moreover, was "to provide and declare . . . a . . . statutory basis for the regulation and control of outdoor advertising." *Id.* § 136-127 (2015). Thus, Article 11 does not give DOT the power to condemn any billboard (along with its related property rights) for any reason. It gives DOT the power to condemn a billboard specifically when DOT is

condemning the billboard because it is prohibited by Article 11.

Here, though, DOT condemned the leasehold interest to widen a highway, not because the billboard that sat on the fee was nonconforming. DOT's authority to do this is found in N.C.G.S. § 136-18(2)(e), which gives DOT the power to condemn property when condemnation of that property is necessary for a state road or highway. DOT therefore was not exercising its authority under Article 11 to acquire prohibited outdoor advertising and all related property rights by condemnation; it was exercising its authority under N.C.G.S. § 136-18(2)(e) to condemn property in order to widen a highway. After all, even if the billboard had been conforming, DOT *still* would have condemned the leasehold interest because it needed the property for its highway-widening project. So the fair market valuation provision specific to Article 11 does not govern this condemnation proceeding; the general fair market valuation provision in Article 9 does instead.[2] But because Article 9 still requires compensation for the fair market value of the property interest taken, DOT has to compensate Adams Outdoor for the fair market value of its leasehold interest.

---

[2] Article 9 does not specify the measure of damages where, as here, DOT purchases a tract of land and then condemns a leasehold interest in that land. Section 136-112 is the only provision in Article 9 specifying the measure of damages when DOT condemns property. This provision discusses the appropriate measure of damages when DOT condemns a partial tract of land versus an entire tract of land. *See* N.C.G.S. § 136-112(1), (2). Because DOT condemned Adams Outdoor's entire property interest—that is to say, because it condemned Adams Outdoor's leasehold interest in an entire tract of land—subsection 136-112(2) applies here.

*2. The outdoor advertising structure (the billboard)*

In a proceeding to determine the fair market value of property under Article 9, "[a]ll factors pertinent to a determination of what a buyer, willing to buy but not under compulsion to do so, would pay and what a seller, willing to sell but not under compulsion to do so, would take for the property must be considered." *M.M. Fowler*, 361 N.C. at 17, 637 S.E.2d at 896 (alteration in original) (quoting *City of Charlotte v. Charlotte Park & Recreation Comm'n*, 278 N.C. 26, 34, 178 S.E.2d 601, 606 (1971)). In other words, the fair market value is the price to which a willing buyer and a willing seller would agree. So the question here is whether a billboard owned by Adams Outdoor, and situated on the site of Adams Outdoor's leasehold interest, would be a factor that a willing buyer and a willing seller would consider when agreeing on the price of that leasehold interest. We are not considering the fair market value of the physical billboard structure as compensable property; we are considering only whether any value that the presence of the billboard adds to the value of Adams Outdoor's leasehold interest should be a factor in determining the fair market value of that interest.

The lease here permitted Adams Outdoor to use the property only "for the purpose of erecting, operating, maintaining, repairing, modifying and reconstructing outdoor advertising structures." And, although Adams Outdoor could cancel the lease during the first twenty years of the lease term only under limited circumstances, these circumstances included if the view of the billboard was obstructed, if the

property was no longer suitable for the billboard, or if the value of the billboard was substantially diminished. These facts show that the value of the leasehold interest was inextricably tied to the value that the billboard added to it.

The value that the billboard added to the leasehold would not just come from rental income, which we discuss separately below. It would also come from the inherent value of the billboard's presence on the property: that is, from the potential to rent it out to advertisers even if it is not currently being used in that way, and from the ability to use the billboard to communicate messages to an audience of approximately 85,000 vehicles per day. Certainly a willing buyer who is purchasing a leasehold that can be used only for outdoor advertising purposes would consider whether the property actually had a billboard on it in determining the price that he or she was willing to pay for the leasehold interest. And certainly a seller who owns a grandfathered-in nonconforming billboard on a leasehold that can be used only for outdoor advertising purposes would consider the presence of that billboard on it in determining the price for which he or she was willing to sell the leasehold interest. We therefore hold that evidence concerning the value that the billboard added to the leasehold interest is admissible to help the trier of fact determine the fair market value of that interest.

The Court of Appeals concluded that the billboard cannot be considered in this condemnation action because, as a trade fixture, it is noncompensable personal property. A trade fixture is a fixture that is attached to land by agreement between

a landlord and tenant for use in exercising a trade. *Stephens v. Carter*, 246 N.C. 318, 320-21, 98 S.E.2d 311, 312-13 (1957). It may be removed after the tenancy and belongs to the tenant as personal property. *Id.* Here, Adams Outdoor's billboard was attached to the land for the purpose of conducting an outdoor advertising business, and Adams Outdoor's lease states that "[a]ll Structures erected by or for the Lessee . . . shall at all times be and remain the property of the Lessee and may be removed by the Lessee . . . , notwithstanding that such Structures are intended . . . to be permanently affixed to the Property." This language clearly indicates that the parties agreed the billboard would be treated as a trade fixture that would remain the personal property of Adams Outdoor. So we agree with the Court of Appeals that this billboard was a trade fixture, and thus was Adams Outdoor's personal property.

As a general rule, the value of personal property cannot be recovered in a condemnation action. *Lyerly v. N.C. State Highway Comm'n*, 264 N.C. 649, 649-50, 142 S.E.2d 658, 658 (1965) (per curiam). And our holding is consistent with this rule. To be clear, we do not hold that Adams Outdoor has the right to recover the value of the physical billboard structure—that is, the value of its personal property—in this condemnation action. It does not. So we are not saying that the trier of fact should add the fair market value of the physical billboard structure to the amount that it determines to be the fair market value of the leasehold interest. But the fact that the billboard, as a trade fixture, was Adams Outdoor's personal property does not preclude the trier of fact from considering the presence of the billboard on the leased

property in determining the fair market value of the leasehold interest. Again, a willing buyer and a willing seller would consider the billboard's presence in agreeing on a price for the leasehold interest itself. We hold only that the trier of fact may therefore consider the value that the billboard's presence adds to the value of that leasehold interest.

*3. The payments from advertisers*

"Injury to a business, including lost profits, is [a] noncompensable loss." *M.M. Fowler*, 361 N.C. at 7, 637 S.E.2d at 890. "[R]evenue derived directly from the condemned property itself, such as rental income," however, is a proper consideration in determining the fair market value of condemned property. *Id.* at 7, 637 S.E.2d at 890.[3] Adams Outdoor argues that the lease payments made by advertisers to display their messages on the billboard should be considered rental income and should therefore be admissible to help determine the fair market value of the leasehold interest here. In deciding this question, "care must be taken to distinguish between income from the property and income from the business conducted on the property." *Id.* at 7, 637 S.E.2d at 890 (quoting 4 Julius L. Sackman et al., *Nichols on Eminent Domain* § 12B.09, at 12B-56 to -59 (rev. 3d ed. 2006)).

---

[3] The majority and dissenting opinions in *Department of Transportation v. M.M. Fowler, Inc.* agreed that it is proper to consider rental income in determining fair market value of condemned property. *Compare* 361 N.C. at 7, 637 S.E.2d at 890 (majority opinion), *with id.* at 18, 637 S.E.2d at 897 (Martin, J., dissenting).

Rental income would obviously include, at the very least, payments received by a landlord who is renting out residential space in a house or apartment building or commercial space in an office building. Here, as in those scenarios, Adams Outdoor was renting out space from its structure—that is, space from its billboard. As with many residential or commercial leases, moreover, Adams Outdoor would enter into long-term contracts with particular parties that would give those parties the right to occupy and use space located on real property—which here meant giving advertisers the right to occupy and use billboard space on its property. As the trial court found, Adams Outdoor was therefore earning "substantial rental income from leasing space on the [b]illboard to advertisers," and the billboard was "essentially self-operating . . . rental property." This rental income is admissible to help the trier of fact determine the fair market value of Adams Outdoor's leasehold interest.

### 4. The permits

"A permit grants a privilege. It does not convey either a constitutional right or a property right." *Hursey v. Town of Gibsonville*, 284 N.C. 522, 529, 202 S.E.2d 161, 166 (1974). The question here, however, is not whether the possession of a permit confers a compensable property right. Instead, the question is whether evidence of permits that Adams Outdoor possessed—and that allowed Adams Outdoor to continue using a nonconforming billboard that had been grandfathered in—is admissible to help the trier of fact determine the fair market value of the leasehold interest to which the permits pertained.

"The jury should take into consideration, in arriving at the fair market value of the [property] taken, all the capabilities of the property, and all the uses to which it could have been applied or for which it was adapted, which affected its value in the market at the time of the taking . . . ." *Barnes v. N.C. State Highway Comm'n*, 250 N.C. 378, 387, 109 S.E.2d 219, 227 (1959). We have stated that a jury may consider "the reasonable probability of a change in the zoning ordinance or of a permit for a non-conforming use." *Northgate Shopping Ctr., Inc. v. State Highway Comm'n*, 265 N.C. 209, 212-13, 143 S.E.2d 244, 246 (1965) (citing *Barnes*, 250 N.C. at 391, 109 S.E.2d at 229-30).

If the reasonable probability of obtaining a permit is admissible, then the existence of already-issued permits should likewise be admissible. Here, taking Adams Outdoor's permits into account makes particular sense given that Adams Outdoor's lease permitted it to cancel the lease or to seek rent abatement if Adams Outdoor was unable to maintain its permits. Evidence of these permits would certainly help inform the trier of fact about the value of a leasehold interest that exists solely to maintain and use the very billboard whose use is sanctioned by the permits. So, for all of these reasons, we hold that evidence of Adams Outdoor's permits is admissible to help the trier of fact determine the fair market value of Adams Outdoor's leasehold interest.

*5. The automatic extension and the options to renew*

As we have already noted, Adams Outdoor's ten-year lease granted an automatic ten-year extension followed by optional ten-year renewal periods. We need to determine whether either of these provisions should be considered by the trier of fact in assessing the fair market value of the leasehold interest. We will address each provision separately.

*A. The automatic ten-year extension*

In *United States v. Petty Motor Co.*, the Supreme Court of the United States held that, when a tenant has a contractual right to renew its lease, "[t]he measure of damages" includes "the value of the right to renew" the lease. 327 U.S. 372, 381 (1946); *accord Alamo Land & Cattle Co. v. Arizona*, 424 U.S. 295, 304 (1976).

Here the automatic ten-year extension provision in Adams Outdoor's lease was an even stronger provision than one that guarantees a contractual right to renew. Under the terms of the automatic extension provision, the lease extension would occur without Adams Outdoor taking any action—Adams Outdoor did not even need to exercise a right to renew—and the landlord could not cancel or decline the extension. Thus, Adams Outdoor essentially had a contractual right to possess the leased property for twenty years (the initial ten-year term plus the automatic ten-year extension). The fact that the lease allowed Adams Outdoor to cancel the lease if one of a small set of specific circumstances arose does not change our analysis. After

all, even if one of those circumstances arose, Adams Outdoor did not have to cancel the lease; it could choose not to cancel it and continue to possess the leasehold for the full twenty-year term.

Because, under *Petty Motor*, a provision that guarantees a contractual right to renew is a proper factor for the trier of fact to consider in determining the fair market value of the leasehold interest, it follows that this automatic extension provision, which is even stronger in substance, is also a proper factor for the trier of fact to consider.

### B. The optional ten-year renewals

The Supreme Court of the United States has drawn a distinction between a contractual right to renew, which is compensable, and a mere expectancy in the renewal of a lease, which is not. *See Petty Motor*, 327 U.S. at 380 n.9 ("The fact that some tenants had occupied their leaseholds by mutual consent for long periods of years does not add to their rights."). In other words, the mere fact that a tenant had previously renewed its lease and expected to keep renewing its lease does not create a compensable property interest in the tenant's expectation that it would be able to keep renewing. This expectation "add[s] nothing to the . . . legal rights" of a tenant, "and legal rights are all that must be paid for." *Id.* (quoting *Emery v. Boston Terminal Co.*, 178 Mass. 172, 185, 59 N.E. 763, 765 (1901)).

As a result, it is not proper for the trier of fact to consider the optional ten-year

lease extensions, as distinct from the first automatic lease extension, in determining the fair market value of Adams Outdoor's leasehold interest. Unlike the automatic extension, any of these optional extensions could be cancelled at will by either Adams Outdoor or the landlord, as long as the cancelling party gave the notice specified in the lease. The lease provision concerning these optional extensions did not give Adams Outdoor a *right* to renew the lease, since the landlord could choose not to go forward with a renewal; the provision created only an *expectancy* in the renewal of the lease.

Adams Outdoor argues that, under *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470 (1973), its renewal expectancy should be a factor in determining the fair market value of its leasehold interest. But *Almota* dealt with a different issue than the one that we consider here. In *Almota*, the Supreme Court addressed whether the likelihood that a lease would be renewed may be factored into the fair market value of *structural improvements* built on the leased land. *See id.* at 473-78. Here, though, the question is whether the mere expectancy of a lease's renewal can be factored into the fair market value of *the leasehold interest itself*. Under *Petty Motor*, it is clear that it cannot be. Adams Outdoor's expectation that it would continue to possess the leased land and rent space on its billboard on that land, despite *either party*'s ability to cancel the optional lease renewals at will, is a mere expectancy that may not be considered in determining the fair market value of Adams Outdoor's leasehold interest.

## 6. *The bonus value method*

As we have already discussed, just compensation for a property interest is the fair market value of that interest—that is, the price that a willing buyer and a willing seller would agree on for the sale of that interest. This Court noted in *Ross v. Perry* that the typical measure of damages for the taking of a leasehold interest is "the difference between the rental value of the unexpired term and the rent reserved in the lease." 281 N.C. at 576, 189 S.E.2d at 229. The Supreme Court of the United States adopted a similar calculation in *Petty Motor*, holding that this calculation should also include the value of any right to renew the lease. 327 U.S. at 381; *accord Alamo Land*, 424 U.S. at 304.

At first glance, the bonus value calculations in *Ross* and *Petty Motor* may seem to conflict with the willing buyer, willing seller approach. On closer inspection, though, the bonus value method is actually just another way to calculate the fair market value of the leasehold interest.

Under the bonus value method, "[i]t is generally held that the fair market value of a leasehold is computed by first determining the fair market *rental* value of the premises and then subtracting from that value the amount of rent to be paid for the remainder of the term pursuant to the lease agreement." 4 Julius L. Sackman, *Nichols on Eminent Domain* § 13.08[6], at 13-72 (3d ed. 2017) (emphasis added). Whether one is determining the fair market value of a leasehold or the fair market

rental value of real property underlying that leasehold, however, the property interest being valued is the same: namely, the right to possess land for a certain period of time.

But the total fair market rental value of real property will still be higher than the fair market value of a tenant's leasehold on that property for the same lease term. That is because a landlord who rents out real property owns the property in fee simple. A tenant who sells his or her leasehold to another tenant, by contrast, owes rent that the other tenant will still have to pay when he or she takes over the lease. A willing buyer and a willing seller of the tenant's leasehold will therefore take into account the rent that is owed under the remainder of the lease when negotiating the price of the leasehold, and will adjust the price downward accordingly. No such adjustment is necessary when determining the fair market rental value of property— that is, the price that a willing tenant and a willing landlord would agree on.

That is why the bonus value method offsets the amount of rent actually owed under the lease for the remainder of the lease term against the fair market rental value of the property in question. A willing buyer and willing landlord would not take that offset into account in negotiating the total price of a lease, so the offset would not be reflected in that price. But, logically, a tenant who willingly buys a leasehold from another tenant would agree to pay only to the extent that the value of the leasehold exceeded what he or she would be paying in rent. Otherwise, he or she would be compensating the selling tenant for rent that the selling tenant had not yet

paid under the lease. So the buying tenant would intuitively make that offset. As a result, the fair market value of a leasehold interest using either the bonus value method or the willing buyer, willing seller approach should, as a practical matter, be the same.

In any determination of the fair market value of a given property interest, however, the jury should consider the same factors that private parties would consider in the sale of that property interest. *Barnes*, 250 N.C. at 387, 109 S.E.2d at 227. As we have already discussed, these factors in this case include the billboard, rental payments, permits, and automatic lease extension. DOT argues that the bonus value method described by DOT's appraiser properly measured the value of Adams Outdoor's leasehold interest. It did not, though, because the appraiser did not consider all of the appropriate factors.[4]

DOT's appraiser testified that he thought that all of the rights granted through the lease would be adequately reflected in the rent being paid. Because of this, he determined the market rental value of the leasehold interest solely by using the rent specified in two of Adams Outdoor's other leases for sites near the site of this lease. But the appraiser's methodology was flawed for two reasons. First, he did not

---

[4] Eminent domain cases, like many other cases involving specialized knowledge, will generally require the use of expert testimony. Because the trier of fact will rely on the specialized knowledge of expert witnesses in eminent domain cases, expert testimony about fair market valuations should take into account all of the factors that a willing buyer and a willing seller would consider in valuing a property interest.

determine whether the nearby leases were truly comparable to Adams Outdoor's lease with respect to the rights granted, such as the right of first refusal to purchase the property and the fact that any successors or assigns of the landlord were bound by Adams Outdoor's lease and did not have the ability to terminate it. Second, he did not account for the value that Adams Outdoor's specific nonconforming billboard, in its specific location, and the enhanced rental income that it generated, along with the permits for the use of that billboard and the automatic lease extension that would have allowed Adams Outdoor to keep using that billboard, added to the value of Adams Outdoor's leasehold interest. By not accounting for these factors, the market rent that DOT's appraiser used in his bonus value method calculation did not properly reflect the fair market rental value of the leasehold interest, leading to a negative valuation.

Any evidence that does not aid the jury in fixing a fair market value of the land "may 'confuse the minds of the jury, and should be excluded.' " *M.M. Fowler*, 361 N.C. at 6, 637 S.E.2d at 890 (quoting *Abernathy v. S. & W. Ry. Co.*, 150 N.C. 97, 109, 63 S.E. 180, 185 (1908)). In particular, an expert witness must use a "method of proof [that] is sufficiently reliable." *Dep't of Transp. v. Haywood County*, 360 N.C. 349, 352, 626 S.E.2d 645, 647 (2006). Here, DOT's appraiser applied the bonus value method incorrectly, which made his method of proof unreliable. Because of this, DOT's bonus value method evidence would confuse the jury and is not admissible.

### III. Conclusion

We conclude that (1) the fair market value provision of Article 9, not Article 11, governs this condemnation proceeding; (2) the value added by Adams Outdoor's billboard may be considered in determining the fair market value of Adams Outdoor's leasehold interest; (3) evidence of rental income derived from leasing advertising space on the billboard may be considered in determining the fair market value of the leasehold interest; (4) the value added to the leasehold interest by the permits issued to Adams Outdoor may be considered in determining the fair market value of the leasehold interest; (5) the automatic ten-year extension of the lease may be considered in determining the fair market value of the leasehold interest, but the options to renew the lease after the automatic ten-year extension may not be; and (6) the bonus value method evidence offered by DOT may not be considered in determining the fair market value of the leasehold interest. We therefore affirm the decision of the Court of Appeals in part and reverse it in part, and remand this case to the Court of Appeals for further remand to the superior court for proceedings not inconsistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART AND REMANDED.

Justice HUDSON concurring in part and dissenting in part.

I agree with the majority that Article 9 and not 11 of N.C.G.S. Chapter 136 governs in this condemnation proceeding. I also agree with the majority's analysis regarding the permits, the lease extensions, and most of its approach to the bonus value method. I disagree with the majority's analysis regarding whether the billboard and the lost income may properly be considered in the valuation of just compensation under Article 9. Accordingly, I would affirm in part, modify and affirm in part, and reverse in part the decision of the Court of Appeals.

Controlling Statutory Scheme

In my view, the Court of Appeals correctly reversed the trial court's decision and concluded that Article 11 does not apply here. As noted below, the trial court's findings and conclusions were based on the erroneous assumption that Article 11 does apply. Specifically, the trial court concluded:

> 3. N.C. Gen. Stat. § 136-131 specifically addresses the subject matter of the DOT condemning nonconforming outdoor advertising locations. It provides that in any such condemnation, just compensation to the owner of the outdoor advertising shall be measured by the fair market value at the time of the taking of the outdoor advertising owner's interest in the real property on which the outdoor advertising is located and such value shall include the value of the outdoor advertising.
>
> . . . .
>
> 5. Because the DOT caused the removal of Adams' nonconforming outdoor advertising property interests at the CHS Lot by way of condemnation, N.C. Gen. Stat. §

136-131 is applicable and controlling in setting the conditions of measuring just compensation.

6.      Although the DOT did not file an action specifically for the *taking* of the *Billboard structure*, its position that the physical structure of the Billboard and the leasehold interest are separate and distinct interests which should be valued separately is contrary to the plain and specific directives in N.C. Gen. Stat. § 136-131 that just compensation to Adams shall include the value of the outdoor advertising.

The trial court's ruling was based upon a misapprehension of law. Accordingly, I agree with the majority that remand is necessary for a determination of just compensation due to Adams Outdoor under Article 9.

Classification of Billboard

Article 9 sets forth the procedures by which the DOT may condemn property, *see* N.C.G.S. §§ 136-103 to -121.1 (2015 & Supp. 2016), and provides that when the DOT condemns an entire tract of land, the measure of damages is "the fair market value of the property at the time of taking," *id.* § 136-112(2) (2015). In determining the fair market value of condemned property, and therefore the compensation to be awarded to the property owner, permanent improvements, such as buildings, "must be taken into account . . . in so far as they add to the market value of the land to which they are affixed." *Proctor v. State Highway & Pub. Works Comm'n*, 230 N.C. 687, 691, 55 S.E.2d 479, 482 (1949); *id.* at 691, 55 S.E.2d at 482 ("Buildings must be regarded as a part of the real estate upon which they stand. Indeed, they are ordinarily without value or utility apart from such realty."). On the other hand, "[n]o

allowance can be made for personal property, as distinguished from fixtures, located on the condemned premises." *Lyerly v. N.C. State Highway Comm'n*, 264 N.C. 649, 650, 142 S.E.2d 658, 658 (1965) (per curiam) (quoting 29 C.J.S. *Eminent Domain* § 175a(1), at 1045 (1941)), *quoted in Midgett v. N.C. State Highway Comm'n*, 260 N.C. 241, 249, 132 S.E.2d 599, 607 (1963), *overruled on other grounds by Lea Co. v. N.C. Bd. of Transp.*, 308 N.C. 603, 304 S.E.2d 164 (1983).

Fixtures, which are objects that are attached to land, are generally treated as permanent improvements and "understood to be a part of the realty." *Lee-Moore Oil Co. v. Cleary*, 295 N.C. 417, 419, 245 S.E.2d 720, 722 (1978) (quoting *Feimster v. Johnson*, 64 N.C. 259, 260 (1870)); *see also Fixture, Black's Law Dictionary* (10th ed. 2014) (defining a "fixture" as "[p]ersonal property that is attached to land or a building and that is regarded as an irremovable part of the real property, such as a fireplace built into a home"). Whether a fixture is an improvement or remains personal property can depend upon whether it is installed by the property owner or a party owning an interest less than the fee, because when a property owner installs a fixture, "the purpose is to enhance the value of the freehold, and to be permanent," but with a tenant "a different purpose is to be served." *Stephens v. Carter*, 246 N.C. 318, 321, 98 S.E.2d 311, 313 (1957) (quoting *Springs v. Atl. Ref. Co.*, 205 N.C. 444, 449, 171 S.E. 635, 637-38 (1933)). This is particularly true with trade fixtures, which are installed for the purposes of exercising a trade and remain the removable personal property of the tenant. *Id.* at 320-21, 98 S.E.2d at 312-13; *see also Wilson v. McLeod*

*Oil Co.*, 327 N.C. 491, 515, 398 S.E.2d 586, 598-99 (1990) ("[W]hen additions are made to [the] land by its owner, it is generally viewed that the purpose of the addition is to enhance the value of the land, and the chattel becomes a part of the land. On the other hand, where the improvement is made by one who does not own the fee, such as a tenant, the law is indulgent and, in order to encourage industry, the tenant is permitted 'the greatest latitude' in removing equipment which he has installed upon the [land]." (internal citations omitted) (quoting *Little v. Nat'l Serv. Indus.*, 79 N.C. App. 688, 692-93, 340 S.E.2d 510, 513 (1986))). "Whether a thing attached to [the] land be a fixture or chattel personal, depends upon the agreement of the parties, express or implied." *Lee-Moore Oil Co.*, 295 N.C. at 419, 245 S.E.2d at 722 (quoting *Feimster*, 64 N.C. at 261); *see also Stephens*, 246 N.C. at 321, 98 S.E.2d at 312 ("The character of the structure, its purpose and the circumstances under which it was erected, the understanding and agreement of the parties at the time the erection was made, must all be considered in determining whether it became a part of the freehold or not." (quoting *W. N.C. R.R. v. Deal*, 90 N.C. 110, 113-14 (1884))).

Here the trial court found, *inter alia*:

> 32.     Because of the permanent nature of the Billboard's construction including being affixed to the land by a concrete foundation 18 feet deep and six feet in diameter, removal and relocation of the entire sign would be impossible.
>
> . . . .
>
> 40.     As the Lease states, Adams and C.H.S. Corporation

intended the Billboard to be permanently affixed to the CHS Lot.

> 41. The Billboard was a leasehold improvement . . . .

Further, the trial court concluded:

> 8. The property adversely affected by the DOT's condemnation is Adam's [sic] leasehold interest as improved by the Billboard.
>
> . . . .
>
> 11. . . . The Billboard could not be relocated intact due to the permanent nature of its construction and because State and local laws prevented such activity. . . .
>
> 12. As between the landowner and Adams, the Billboard was the property of Adams and upon expiration of the Lease, Adams retained the discretion to salvage its sign parts. Notwithstanding, the way the Billboard was constructed and affixed to the land made it a leasehold improvement, and for purposes of condemnation, the right of Adams as the tenant to salvage parts cannot be used as a basis for adversely affecting just compensation.
>
> 13. As of the Date of Taking, Adams' recorded Lease constituted an interest in real property as improved by a sign.

I agree with the Court of Appeals that the trial court's findings and conclusions—that the billboard was a permanent improvement as opposed to personal property—were not supported by the evidence and were contrary to law.

It is not disputed that the billboard was erected for business purposes and therefore is a trade fixture. Looking to the express agreement of Adams Outdoor and C.H.S. Corporation (CHS), then-owner of the land, the lease provided:

-29-

> All Structures erected by or for the Lessee . . . on the Property shall at all times be and remain the property of the Lessee and may be removed by the Lessee before or within a reasonable time of termination or expiration of this lease, notwithstanding that such Structures are intended by Lessor and Lessee to be permanently affixed to the Property.

It is clear that the intent of the parties was that any structures affixed to the property, including the billboard at issue here, did not become part of the real property, but instead remained the removable personal property of Adams Outdoor. Additionally, as the Court of Appeals noted: Adams Outdoor classified its billboard structures as "Business Personal Property" for tax purposes and paid property taxes in accordance with that classification, and Adams Outdoor's vice president for real estate admitted that the billboard was personal property. *DOT v. Adams Outdoor Advert. of Charlotte, Ltd. P'ship*, ___ N.C. App. ___, ___, 785 S.E.2d 151, 157-58 (2016).

Moreover, in considering the "[t]he character of the structure, its purpose and the circumstances under which it was erected," *Stephens*, 246 N.C. at 321, 98 S.E.2d at 312, the billboard, unlike a building or other permanent improvements, is not "without value or utility apart from [the] realty," *Proctor*, 230 N.C. at 691, 55 S.E.2d at 482. As the Court of Appeals pointed out, Adams Outdoor in fact "removed the billboard and structure from the CHS Lot by carefully dismantling them and reinstalling major components thereof at another billboard location along Independence Boulevard, as permitted by the lease agreement." *Adams Outdoor*, ___ N.C. App. at ___, 785 S.E.2d at 157. Nor was the billboard erected to "enhance the

value of the freehold, and to be permanent." *Stephens*, 246 N.C. at 321, 98 S.E.2d at 313. Rather, as the majority notes, "Adams Outdoor's billboard was attached to the land for the purpose of conducting an outdoor advertising business." The billboard was intended to last only until Adams Outdoor decided to remove it, or for as long as the lease itself, which could be terminated at Adams Outdoor's discretion if and when one of the circumstances enumerated in the agreement made the advertising business unprofitable.[1] Accordingly, the billboard was a trade fixture that remained the personal property of Adams Outdoor.

While explicitly agreeing that the billboard was personal property, the majority nevertheless deems it appropriate in determining the value of the leasehold for the trial court to consider the "inherent value of the billboard's presence on the property." But, pursuant to the agreement of the parties, this particular billboard's

---

[1] The lease's cancellation provision reads:

> CANCELLATION: If, in Lessee's sole opinion: a) the view of the advertising copy on any Structure becomes obstructed; b) the Property cannot be safely used for the erection, maintenance or operation of any Structure for any reason; c) the value of any Structure is substantially diminished, in the sole judgment of the Lessee, for any reason; d) the Lessee is unable to obtain, maintain or continue in force any necessary permit for the erection, use or maintenance of any Structure as originally erected; or, e) the use of any Structure, as originally erected, is prevented by law or by exercise of any governmental power; then Lessee may, at its option, either: (i) reduce and abate rent in proportion to the impact or loss that such occurrence has upon the value of Lessee's Structure for so long as such occurrence continues; or, (ii) cancel this Lease and receive a refund of any prepaid rent, prorated as of the date of cancellation.

"presence on the property" was not bound to the lease, as Adams Outdoor specifically contracted for the right to remove it as personal property. *See Ingold v. Phoenix Assurance Co.*, 230 N.C. 142, 145, 52 S.E.2d 366, 368 (1949) ("[T]he intent of the parties as evidenced by their contract, express or implied, is controlling."). Moreover, as the majority itself then explains, the value of the billboard consists entirely of its potential to produce income, "that is, from the potential to rent it out to advertisers." As discussed more fully below, I do not view this potential as compensable under Article 9, and therefore conclude that this "value" should not be considered in determining the fair market value of Adams Outdoor's leasehold interest. Accordingly, I disagree with the majority and would affirm the Court of Appeals on this issue.

### Loss of Income

I also disagree with the majority's Article 9 analysis regarding the consideration of the income from the advertising business located on the billboard. Historically, this Court has not considered business income in determining just compensation in a condemnation action.[2] The majority, citing *M.M. Fowler*, states

---

[2] When U.S. Supreme Court Justice Oliver Wendell Holmes served on the Supreme Judicial Court of Massachusetts, he explained, in a passage often quoted by this Court, *see Pemberton v. City of Greensboro*, 208 N.C. 466, 470, 181 S.E. 258, 260 (1935); *Williams*, 252 N.C. at 148, 113 S.E.2d at 268; *DOT v. M.M. Fowler, Inc.*, 361 N.C. 1, 8-9, 637 S.E.2d 885, 891 (2006), that

> [i]t generally has been assumed, we think, that injury to a business is not an appropriation of property which must be paid for. There are many serious pecuniary injuries which may be

that "care must be taken to distinguish between income from the property and income from the business conducted on the property"; however, the majority then proceeds to misapply this very principle. *DOT v. M.M. Fowler, Inc.*, 361 N.C. 1, 7, 637 S.E.2d 885, 890 (2006) (quoting 4 Julius L. Sackman et al., *Nichols on Eminent Domain*, § 12B.09, at 12B-56 to -59 (rev. 3d ed. 2006)). In my opinion, the revenue from advertisements placed on the billboard is business income, and is not equivalent to rental income received for the use of the land. In holding to the contrary, the majority relies solely upon *M.M. Fowler*, but in my view, the majority's conclusion is difficult to square with our Court's decision in *M.M. Fowler*. As such, I dissent on this issue as well.

---

inflicted without compensation. It would be impracticable to forbid all laws which might result in such damage, unless they provided a *quid pro quo*. No doubt a business may be property in a broad sense of the word, and property of great value. It may be assumed for the purposes of this case that there might be such a taking of it as required compensation. But a business is less tangible in nature and more uncertain in its vicissitudes than the rights which the Constitution undertakes absolutely to protect. It seems to us, in like manner, that the diminution of its value is a vaguer injury than the taking or appropriation with which the Constitution deals. A business might be destroyed by the construction of a more popular street into which travel was diverted, as well as by competition, but there would be as little claim in the one case as in the other. It seems to us that the case stands no differently when the business is destroyed by taking the land on which it was carried on, except so far as it may have enhanced the value of the land.

*Pemberton*, 208 N.C. at 470, 181 S.E. at 260 (citations omitted) (quoting *Sawyer v. Commonwealth*, 182 Mass. 245, 247, 65 N.E. 52, 53 (1902)).

Most recently we addressed lost business income in the context of a condemnation action in *M.M. Fowler*, in which we stated that "[t]he longstanding rule in North Carolina is that evidence of lost business profits is inadmissible in condemnation actions." 361 N.C. at 7, 637 S.E.2d at 891 (citing *Pemberton v. City of Greensboro*, 208 N.C. 466, 470-72, 181 S.E. 258, 260-61 (1935)). More specifically, the Court held in *M.M. Fowler* that:

> Admission of evidence that does not help the jury calculate the fair market value of the land or diminution in its value may "confuse the minds of the jury, and should be excluded." In particular, specific evidence of a landowner's noncompensable losses following condemnation is inadmissible.
>
> Injury to a business, including lost profits, is one such noncompensable loss. It is important to note that revenue derived directly from the condemned property itself, such as rental income, is distinct from profits of a business located on the property. . . . When evidence of income is used to valuate property, "care must be taken to distinguish between income from the property and income from the business conducted on the property."

*Id.* at 6-7, 637 S.E.2d at 890 (citations omitted). Accordingly, there is a distinction between "revenue derived directly from the condemned property itself, such as rental income,"[3] and revenue from "a business located on the property." *Id.* at 7, 637 S.E.2d at 890. The latter was at issue in *M.M. Fowler* when the landowner "attempted to

---

[3] Although the trial court's order refers to "rental income" from the billboard, it appears that the court is actually referring to business revenue received by Adams Outdoor from entities placing ads on the billboard. For condemnation purposes, the only "rental" paid here was by Adams Outdoor to CHS to lease the land on which to place its billboard.

recover for harm to its business rather than damage to the land itself." *Id.* at 7, 13, 637 S.E.2d at 890, 894.

Regarding lost profits from a business located on the property, the Court held that quantified evidence of lost business profits was inadmissible to determine the fair market value of the land. *Id.* at 14-15, 637 S.E.2d at 895. In discussing our prior decision in *Kirkman v. State Highway Commission*, 257 N.C. 428, 126 S.E.2d 107 (1962), the Court opined:

> *Kirkman* clearly does not permit quantified evidence of lost business profits. There is no difference between using lost profits to determine the fair market value of the land and awarding them as a separate item of damages. By either improper calculation, the business receives compensation for its lost profits.
>
> Thus, in *Kirkman*, we did not approve the use of quantified evidence of lost profits. To the contrary, this Court held unquantified lost business profits are a fact that can be *generally* considered in determining whether there has been a diminution in value in the land that remains after a partial taking. Our decision in *Kirkman* must be read with our other cases, which clarify that although the jury may consider adverse effects resulting from condemnation that decrease the value of the remaining property, these effects "are not separate items of damage, recoverable as such, but are relevant only as circumstances tending to show a diminution in the over-all fair market value of the property." Allowing the jury to consider that the land may be less valuable due to the condemnation's effect on the landowner's business does not require quantified evidence of lost profits also be admitted. This is an important distinction which unifies our analysis in both *Kirkman* and *Pemberton*. Neither opinion sanctions admission of quantified lost profits evidence.

*Id.* at 14-15, 637 S.E.2d at 895 (citations omitted). Notably, *M.M. Fowler* involved a partial condemnation, as opposed to a condemnation of an entire tract; however, it appears that while quantified evidence of lost profits from a business located on a property is inadmissible, unquantified evidence of those profits may be "broadly" or "generally" considered in determining the fair market value. *Id.* at 14-15, 637 S.E.2d at 895.

Here the revenue received by Adams Outdoor from advertisers to display advertisements on the billboard was not rental income derived directly from the property, but rather business profits from an advertising business located on the property. Adams Outdoor is attempting "to recover for harm to its business rather than damage to the land itself." *Id.* at 7, 13, 637 S.E.2d at 890, 894. The contracts between Adams Outdoor and its advertisers are not contracts for others to personally occupy and enjoy the real property, but rather for the advertisers to attach their personal property advertisements to Adams Outdoor's personal property, which is attached to the real property for the sole purpose of operating a business. Moreover, unlike the real property that was taken by DOT, this business is not intended to last forever, but only so long as it is profitable. See footnote 1. In my view, the revenue Adams Outdoor received from this business conducted on the property is too attenuated to be considered "revenue derived directly from the condemned property itself." *Id.* at 7, 637 S.E.2d at 890.

I am unable to conclude, as the majority does, that Adams Outdoor's renting of billboard space is analogous to the renting of residential space in a house or apartment building, or commercial space in an office building. Houses, apartment buildings, and office buildings are permanent improvements and considered part of the real property itself—tenants of those buildings contract for the right to occupy and use some part of that real property. As previously discussed, the billboard here is not part of the real property, but rather is personal property belonging to Adams Outdoor.

Accordingly, the revenue that Adams Outdoor seeks to have considered is lost business profit. Under *M.M. Fowler* quantified evidence of this revenue may not be considered; however, unquantified evidence of Adams Outdoor's lost business profits may be "broadly" or "generally" considered in determining the fair market value of the leasehold interest. *Id.* at 14-15, 637 S.E.2d at 895. The Court of Appeals correctly determined that the revenue was lost business profit but did not acknowledge that Adams Outdoor's lost business could be considered more generally as unquantified evidence. Thus, I would modify and affirm the decision of the Court of Appeals on this issue.

<u>The Permits, Lease Extensions, Bonus Value Method</u>

The grandfathered permits allowing Adams Outdoor to operate a billboard (otherwise nonconforming) specifically enabled Adams Outdoor to station its personal property and conduct its business in a manner and location that would not otherwise

be legally possible.  Accordingly, I agree with the majority that evidence of Adams Outdoor's permits is admissible in determining the fair market value of the leasehold interest.  I also agree with the majority's analysis concluding that the automatic ten-year extension of the lease is a proper factor for consideration in determining the fair market value of Adams Outdoor's leasehold, and that the subsequent optional ten-year extensions are too speculative to consider.  Additionally, I agree with the majority's analysis regarding the bonus value method; I note only that, because I disagree with the majority's analysis regarding the consideration of the billboard and the advertising revenue, I disagree with which factors would constitute the "appropriate factors."

## Conclusion

For the reasons set forth herein, I respectfully concur in part, and dissent in part.

Justices BEASLEY and MORGAN join in this concurring and dissenting opinion.