Finkel v. Palm Park, Inc., 2020 NCBC 84.

STATE OF NORTH CAROLINA
COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 14515

DAVID FINKEL; HD FUNDING,
INC., and HORIZON FUNDING,
LLC,

          Plaintiffs,

   v.

PALM PARK, INC.; NATHAN
BYELICK; MARGARET
BYELICK; OAK CREST
PROPERTY MANAGEMENT,
INC.; and THE OAKS AT
NORTHGATE, LLC,

          Defendants.

ORDER AND OPINION ON
VALUATION OF THE OAKS AT
NORTHGATE, LLC

THIS MATTER comes before the Court following an evidentiary hearing regarding the valuation of The Oaks at Northgate, LLC ("TONG") pursuant to N.C.G.S. § 57D-6-03(d) following an evidentiary hearing held on September 14 and 15, 2020 ("the Hearing").

THE COURT, having considered the evidence presented at the hearing and the evidence presented at trial, the briefs filed by Plaintiffs and Defendants, the arguments of counsel at the hearing, the applicable law, and other appropriate matters of record, FINDS and CONCLUDES, as set forth below.

> *Fox Rothschild, LLP, by Mark A. Finkelstein, Esq. and Stephen W. Petersen, Esq. for Plaintiffs David Finkel, HD Funding Inc., and Horizon Funding, LLC.*
>
> *J.C. White Law Group, PPLC, by James C. White, Esq., and Shilanka I. Ware, Esq. for Defendants Palm Park, Inc., Nathan Byelick, Margaret*

*Byelick, Oak Crest Property Management, Inc., and The Oaks At Northgate, LLC.*

McGuire, Judge.

## I.    BACKGROUND

1.    This dispute arises out of disagreements between the two members of TONG, Horizon Funding, LLC ("Horizon") and Oak Crest Property Management, Inc. ("Oak Crest"), over the management of TONG (collectively, Horizon and Oak Crest are "the Parties"). Plaintiff David Finkel ("Finkel") owns Horizon, and Defendants Nathan Byelick and Margaret Byelick ("Byelicks") are the sole shareholders of Oak Crest. Horizon owns a 37.5% interest in TONG, and Oak Crest owns a 62.5% interest.

2.    TONG's sole asset is a 100% stock ownership in Palm Park, Inc. ("Palm Park"). Palm Park owns three properties:  a multi-tenant office building at 1135 Kildaire Farm Road, Cary; a multi-tenant office warehouse building at 3221 Durham Drive, Raleigh; and a multi-tenant flex warehouse building at 527 E. Chatham Street, Cary (collectively, the three properties owned by Palm Park are the "Properties"). Palm Park does not manage the Properties, but rather contracts management to a third-party commercial management firm, Colliers International ("Colliers").

3.    This case was tried from January 13, 2020 through January 22, 2020 in the Superior Court of Wake County. Horizon's claim for constructive fraud was tried to the jury, and Horizon's claim for judicial dissolution of TONG was tried to the Court. On January 22, 2020, the jury returned its verdict on the issues of

liability and damages, finding that the Byelicks breached fiduciary duties to Horizon by: (a) allowing Palm Park to pay for personal expenses for the Byelicks, their family members, or the Byelicks' separately-owned companies; and (b) allowing Palm Park to enter into lease agreements and amendments with companies owned by the Byelicks. The jury awarded Horizon $41,784.25 in damages.

4. On February 11, 2020, the Court entered its Final Judgment on the jury's verdict. (ECF No. 149.) The Court, in its discretion, also entered judgment for Horizon on its claim for judicial dissolution of TONG pursuant to N.C.G.S. § 57D-6-02(2)(ii). Further, the Court found that given the evidence presented at trial, TONG's liquidation was necessary to protect the rights and interests of Horizon as a member of TONG and concluded that TONG should be dissolved as a matter of law. (*Id.* at p. 3.)

5. On April 24, 2020, the Court issued an Amended Final Judgment allowing Oak Crest to elect whether to purchase Horizon's ownership interest in TONG pursuant to N.C.G.S. § 57D-6-03(d), which provides, "[i]n any proceeding brought by a member under clause (ii) of [N.C.]G.S. 57D-6-02(2) in which the court determines that dissolution is necessary, the court will not order dissolution if after the court's decision the LLC or one or more other members elect to purchase the ownership interest of the complaining member at its fair value in accordance with any procedures the court may provide." (Am. Final Judgment, ECF No. 157, at pp. 7–8.) Oak Crest subsequently elected to purchase Horizon's membership interest.

6.     On May 5, 2020, the Court issued an Order Appointing Receiver, appointing a receiver solely for the purpose of managing the operations and business of TONG until the sale of Horizon's membership interest to Oak Crest is completed.

7.     The Court held a conference with counsel during which they requested retention of Frank D. Leatherman, Jr. ("Leatherman"), MAI, CCIM, an experienced Wake County real estate appraiser, to appraise the Properties. Leatherman had performed multiple appraisals of the Properties over the years for different business purposes. The Parties stipulated to an effective appraisal date of February 11, 2020.

8.     On June 18, 2020, Leatherman issued his initial appraisal reports for each of the Properties ("June 18 Reports"). Defendants found certain calculation errors in the June 18 Reports and brought those errors to the attention of the receiver.[1] The receiver asked Leatherman to review the June 18 Reports and correct the errors. On July 9, 2020, Leatherman issued revised appraisal reports correcting the errors identified by Defendants ("July 9 Reports"). The corrected calculations decreased the appraised values of the Properties. However, without discussion or explanation, Leatherman made several adjustments to the inflation and capitalization rate assumptions he used in the June 18 Reports. The unexplained adjustments resulted in the final appraised values of the Properties remaining essentially unchanged from the June 18 Reports.

9.     The Court set, and subsequently extended, deadlines for the Parties to submit briefs on the appropriate methodology for determining the fair value of

---

[1] The Court's understanding is that the errors in the June 18 Reports were caused by Leatherman's use of an outdated software in determining discounted cash flow rates.

Horizon's interest in TONG.  (Orders on Briefing, ECF Nos. 162 and 167.)  On July 17, 2020, Horizon filed its Memorandum in Support of the Proper Methodology for a Fair Valuation of TONG, LLC (ECF No. 173), and the Affidavits of Jay Taylor ("Taylor") (ECF No. 174), and David Finkel (ECF No. 175).  On July 17, 2020, Oak Crest filed its Memorandum of Law Regarding Valuation of [TONG, LLC] (ECF No. 176), and nine supporting exhibits (ECF No. 176.1–9.)

10.    On July 31, 2020, Horizon filed a Fair Valuation Response Brief (ECF No. 177) and the Affidavit of Jeanne M. Foley (ECF No. 178).  On July 31, 2020, Oak Crest filed its Response to Plaintiffs' Valuation Brief.  (ECF No. 179.)

11.    On September 11, 2020, Horizon and Oak Crest filed a set of Stipulated Facts for Valuation Hearing.  (Stipulations, ECF No. 183.)

## II.    THE HEARING

12.    On September 14 and 15, 2020, the Court held the Hearing.  At the Hearing, Horizon presented the testimony of Leatherman, Taylor, who was qualified as an expert in commercial real estate brokerage, and Finkel.  Oak Crest presented testimony from Jerry L. Wilcoxon ("Wilcoxon"), CPA/ABV, CVA, an expert in business valuation.

13.    In addition, the Court admitted numerous exhibits offered by the Parties designated as Plaintiffs' Valuation Hearing Exhibits ("PVH Ex.") and Defendants' Valuation Hearing Exhibits ("DVH Ex.").

14.    The parties also stipulated to certain financial data regarding TONG and Palm Park necessary to conduct the valuation of TONG as follows:

| DESCRIPTION OF ASSET OR LIABILITY | AMOUNT AS OF FEBRUARY 2020 |
| --- | --- |
| Current Cash Assets of Palm Park | $ 298,360.00 |
| Indemnity advance by Palm Park, Inc. to Byelicks | 231,428.32 |
| Principal Balance Loan A: 1135 Kildaire Farm Rd. | 1,816,890.15 |
| Principal Balance Loan B: 1135 Kildaire Farm Rd. | 391,209.71 |
| Principal Balance Loan C: 3221 Durham Drive | 657,541.20 |
| Palm Park Current Liabilities other than loans listed elsewhere on this chart | 144,146.83 |
| Cannon Family Charitable Remainder UniTrust loan principal balance - does not account for defeasance or profit sharing | 470,224.54 |
| Cannon Family Trust Note principal balance – does not account for defeasance or profit sharing | 649,815.54 |
| TONG Current Assets | 30,000.00 |
| TONG Current Liabilities other than loans | 0 |

*A. Horizon's Position*

15. Horizon contends that TONG is effectively a real estate holding company. Horizon argues that TONG is not an operating entity, and that it exists solely for the purpose of owning 100% of the stock of Palm Park, which exists solely to own and collect rents from tenants of the Properties.

16. Horizon argues that TONG should be valued using a "net asset" approach under which the fair value of TONG is calculated by taking the aggregate appraised values of the Properties, as determined by Leatherman, adding to that figure Palm Park's and TONG's other assets, and subtracting Palm Park's and TONG's debts/liabilities. At the hearing, Taylor testified that according to his experience as a broker for numerous commercial real estate transactions, including transactions like the sale of limited liability companies that were real estate holding companies, Horizon's proposed net asset approach is an accepted method of valuing

commercial property. Finkel also testified that per his experience as a real estate investor, the net asset approach is commonly used to determine the value of commercial properties.

*B. Oak Crest's Position*

17. Oak Crest agrees that the net asset approach is the proper method for determining the fair value of TONG, but contends that Palm Park is a real estate holding company and TONG is an investment holding company.[2] Therefore, Oak Crest argues that the fair value of TONG should be determined based on the fair market value of Horizon's interest in TONG using an "orderly liquidation"[3] premise based on a hypothetical unforced liquidation of TONG's assets.

18. The Parties agree that no marketability or lack of control discounts should be applied in determining the fair value of TONG.

*C. Leatherman's Reports and Horizon's Proposed Valuation*

19. As noted above, Leatherman issued the June 18 Reports (DVH Ex. 13, 3221 Durham Drive; DVH Ex. 15, 1135 Kildaire Farm Road; DVH Ex. 17, 527 E. Chatham Street) and revised July 9 Reports (PVH Ex. 14, 3221 Durham Drive; PVH Ex. 15, 1135 Kildaire Farm Road; PVH Ex. 16, 527 E. Chatham Street). In the June 18 Reports, Leatherman considered three approaches in determining the value of

---

[2] Oak Crest does not contend that TONG is an operating company.

[3] "Orderly Liquidation Value is defined as: '[A]n opinion of gross amount, expressed in terms of money, that typically could be realized from a liquidation sale, given a reasonable period of time to find a purchaser (or purchasers), with the seller being compelled to sell with a sense of immediacy on an as-is, where-is basis, as of a specific date.'" *In re Motors Liquidation Co.*, 576 B.R. 325, 437(S.D.N.Y. 2017).

the Properties: a cost approach based on the amounts actually paid by Palm Park for the Properties; a sales comparison approach using sales of comparable properties in the relevant market; and an income capitalization approach based on an analysis of the current and/or future income generating potential of the Properties.

20.     Leatherman also visited and inspected the Properties and conducted a thorough analysis of information relevant to appraising the Properties including market conditions and the condition of, and improvements made to, the Properties.

21.     In applying the sales comparison approach, Leatherman used six relatively recent sales of similar commercial properties to determine an adjusted sales price per square foot for each of the Properties.

22.     In applying the income capitalization approach, Leatherman considered different methods of determining the capitalized value of the Properties and ultimately performed a discounted cash flow analysis and a direct capitalization analysis, applying assumptions regarding the appropriate direct capitalization rate, terminal capitalization rate, rent inflation rate, and expense inflation rate. Leatherman ultimately concluded that the discounted cash flow analysis, rather than direct capitalization analysis, was the better method of valuing the Properties. In addition, although Leatherman did not use the sales comparison values to determine the appraised value of the Properties, he concluded that the sales comparison approach "supported" the discounted cash flow analysis. (DVH Exs. 13, pp. 92–94; DVH Ex. 15, pp. 86–88; DVH Ex. 17, at pp. 99–101.)  The valuation

determinations that Leatherman reached in his June 18 Reports are summarized as follows:

| | 3221 Durham Dr. | | 527 E. Chatham St. | | 1135 Kildaire Farm Rd. |
|---|---|---|---|---|---|
| Sales Comparison Approach | $3,430,000 | | $875,000 | | $7,390,000 |
| Income Capitalization Approach (discounted cash flow) | $3,385,000 | | $825,000 | | $7,405,000 |
| Direct Capitalization Approach | $2,875,000 | | $820,000 | | $4,740,000 |
| Final Value Conclusion | $3,385,000 | | $825,000 | | $7,405,000 |

23.     The final aggregate appraised value of the Properties as determined by Leatherman in the June 18 Reports was $11,615,000.00.

24.     Leatherman subsequently issued the July 9 Reports to correct certain errors in the June 18 Reports.  Although there was no change in the values using the Sales Comparison approach, the corrections resulted in a significant decrease in the appraised values as determined using the discounted cash flow analysis:[4]

| | Corrected Income Capitalization Calculations | | | | |
|---|---|---|---|---|---|
| | 3221 Durham Dr. | | 527 E. Chatham St. | | 1135 Kildaire Farm Rd. |
| Sales Comparison Approach | $3,430,000 | | $875,000 | | $7,390,000 |
| Income Capitalization Approach (discounted cash flow) | $2,973,000 | | $677,000 | | $5,866,000 |

25.     If no other changes were made to the assumptions or methodology used in the Leatherman June 18 Reports and each of the Properties were valued using

_____

[4] These figures are drawn from Wilcoxon's Valuation Report (DVH Ex. 36, at p. 21), but are not disputed by Horizon.

the discounted cash flow value, the corrections would result in an aggregate appraisal value for the Properties of $9,516,000.00.

26. However, the July 9 Reports left the appraised values of the Properties virtually unchanged from the June 18 Reports as follows:

| | 3221 Durham Dr. | 527 E. Chatham St. | 1135 Kildaire Farm Rd. |
|---|---|---|---|
| Cost Approach | N/A | N/A | N/A |
| Sales Comparison Approach | $3,430,000 | $ 875,000 | $7,390,000 |
| Income Capitalization Approach (discounted cash flow) | $3,440,000 | $825,000 | $7,340,000 |
| Final Value Conclusion | $3,435,000 | $825,000 | $7,365,000 |

27. The final aggregate appraised value of the Properties in the July 9 Reports is $11,625,000.00, an increase in the aggregate appraised value of $10,000.00 from the aggregate appraisal value of the Properties in the June 18 Reports.

28. Leatherman arrived at the final valuations of the Properties in the July 9 Reports by adjusting several assumptions that he used in the June 18 Reports. In the Leatherman July 9 Reports: a) Leatherman increased his rent inflation assumptions from 3.0% to 4.0% and decreased the expense inflation rates from 2.3% to 2.0%; and b) for the 1135 Kildaire Farm Road property, Leatherman decreased the direct capitalization rate from 8.0% to 7.0%, decreased the terminal capitalization rate from 8.5% to 7.5%, and decreased the discount rate from 9.0% to 8.5%. Although the July 9 Reports were issued just three weeks after the June 18 Reports, Leatherman provided no explanation for these changes. At the hearing,

Leatherman was questioned about the changes in the assumptions between the two sets of reports. His only explanation was that at the time he issued the July 9 Reports, he had concluded that the commercial rental market in February 2020 was better than he had previously believed, and that this led him to change certain assumptions. He did not explain the basis for this changed conclusion.

29. In addition, instead of using only the discounted cash flow value as he had done in the June 18 Reports, in the July 9 Reports, Leatherman used an average of the values reached through the sales comparison approach and discounted cash flow analysis for the 1135 Kildaire Farm Road and 3221 Durham Drive properties. In the July 9 Reports Leatherman did not explain why he changed the calculation method other than noting that "the Sales Comparison Approach directly supports the Income Capitalization Approach." (PVH Ex. 14, at p. 93; PVH Ex. 16, at p. 100.)

30. Horizon argues that the fair value of TONG should be determined by a simple net asset calculation, adding the appraised values of the Properties to Palm Park's and TONG's other stipulated assets, and subtracting Palm Park's and TONG's stipulated liabilities. (ECF No. 177, at pp. 16–17.) However, Horizon contends the Court should value the Properties using the aggregated appraisal values in the Leatherman July 9 Reports as determined by *the sales comparison approach only*, and not the discounted cash flow analysis values, resulting in an aggregated value of $11,695,000.00. (*Id.*) Horizon argues that the Court should add Palm Park's stipulated Current Cash Assets to the aggregated appraisal value of the Properties, but with an adjustment decreasing the cash assets from $298,360 to

$274,964.04. (*Id.*; explaining reason for adjustment).) Horizon also adds a receivable for an indemnity advance made by Palm Park to the Byelicks in the amount of $231,428.32.[5] (*Id.*) Horizon does not seek to add to TONG's assets a $30,000.00 entry in the stipulated assets and liabilities listed only as "TONG Current Assets." Horizon contends TONG's assets should thus be valued at $12,201,374.36. (*Id.* at p. 16.)

31. TONG's total stipulated liabilities are $4,129,827.97. (*Id.* at p. 17; ECF No. 183.) Horizon contends that the net asset value of TONG, subtracting TONG's liabilities from its assets, is $8,071,546.69. Accordingly, Horizon argues that the value of its 37.5% membership share in TONG is $3,026,830.01. (*Id.* at p. 17.)

*D. Wilcoxon's Report and Oak Crest's Valuation*

32. Wilcoxon prepared a "Valuation Analysis of TONG as of February 11, 2020" (dated September 15, 2020). ("Wilcoxon's Valuation Report," DVH Ex. 36.) Wilcoxon described his assignment as "determin[ing] the Fair Market Value of a 37.5% Membership Interest in [TONG] on a control, marketable basis as of February 11, 2020." (*Id.* at p. 6.)

33. Wilcoxon considered three potential approaches to valuing TONG and Horizon's membership interest: an income approach, a market approach, and a net asset approach. (*Id.* at pp. 4 and 13–14.) Wilcoxon chose to use a net asset approach, concluding that a "common application of the asset accumulation method is in the

---

[5] This amount represents the attorneys' fees and costs advanced to the Byelicks for defense of this lawsuit pursuant to Palm Park's bylaws. Defendants stipulated that the advances are owed back to Palm Park.

valuation of 'holding Company' type entities, whose sole function is investing in other businesses or in marketable securities." (*Id*. at p. 14.)

34. As a starting point for determining the values of the Properties, Wilcoxon corrected Leatherman's errors in calculating the values of the Properties under the discounted cash flow approach and the direct capitalization approach in the June 18 Reports, but applied the rent inflation, expense, direct capitalization rate, and terminal capitalization rate assumptions used in Leatherman's June 18 Reports, and not the modified assumptions used in Leatherman's July 9 Reports. (*Id*. at pp. 21 and 24–25.) The corrections result in the following corrected values:

| | Corrected Income Capitalization Calculations using Leatherman's June 18 Report Assumptions | | |
| --- | --- | --- | --- |
| | 3221 Durham Dr. | 527 E. Chatham St. | 1135 Kildaire Farm Rd. |
| Sales Comparison Approach | $3,430,000 | $875,000 | $7,390,000 |
| Corrected Income Capitalization Approach (discounted cash flow) | $2,973,000 | $677,000 | $5,866,000 |
| Corrected Direct Capitalization Approach | $2,875,000 | $820,000 | $4,740,000 |

(*Id*.)

35. Based on a comparison of the corrected capitalization figures, Wilcoxon concluded that Leatherman's direct capitalization values, as determined in the July 9 Reports, were a more "consistent" and "reliable" value determination than the discounted cash flow values. (*Id*. at p. 25.) Based on this conclusion, Wilcoxon arrived at final values for the Properties by using the direct capitalization and sales comparison values appearing in Leatherman's July 9 Reports, and by averaging the

direct capitalization approach and sales approach values to reach a final value for the 1135 Kildaire Farm Road property and the 3221 Durham Drive properties, and using the value determined by the direct capitalization approach to reach a final value for the 527 E. Chatham Street property as follows:

| | Wilcoxon's Final Accepted Values per Appraisal Report dated July 9, 2020 | | |
|---|---|---|---|
| | 3221 Durham Dr. | 527 E. Chatham St. | 1135 Kildaire Farm Rd. |
| Sales Comparison Approach | $3,430,000 | $875,000 | $7,390,000 |
| Direct Capitalization Approach | $2,875,000 | $820,000 | $5,480,000 |
| Final Value Conclusion | $3,152,500 | $820,000 | $6,435,000 |

(*Id.* at p. 26.)  Wilcoxon's aggregate appraised value for the Properties is $10,407,500.00.  (*Id.* at 27.)

36.    Using his corrected values for the Properties, Wilcoxon then created a hypothetical "orderly liquidation" of Palm Park.  First, Wilcoxon deducted from the aggregate appraised value a hypothetical 6% "costs of sale" for legal and broker fees that the Parties would pay to sell the Properties ($624,450.00).  (*Id.* at p. 27.) Wilcoxon also deducted the federal and state capital gains taxes that would be payable by Palm Park as a C-corporation on the hypothetical sale of the Properties ($1,944,970.00).  (*Id.*)  Deducting the sales costs and capital gains taxes, Wilcoxon arrived at a "Net Realizable Value" for the Properties of $7,838,080.00.  (*Id.* at p. 27.) Wilcoxon then conducted a net asset calculation for Palm Park and determined that

the fair market value of TONG's 100% stock interest in Palm Park was $5,151,867.00.[6] (*Id*. at p. 28.)

37. Wilcoxon next calculated the fair market value of the members equity in TONG by performing a net asset analysis. (*Id*. at p. 29.) Wilcoxon added to TONG's assets $30,000.00 for "TONG Current Assets" listed in the stipulation, then deducted the stipulated amounts due from TONG under promissory notes payable to the Cannon Family Trusts ("CFT") and the Cannon Family Charitable Remainder Unitrust ("CFCRU"). (*Id*.) Wilcoxon also deducted from the net asset value of TONG an amount of $184,551.00 for capital gains taxes that TONG allegedly would owe upon the liquidation of its investment in Palm Park. (*Id*. at pp. 28 and 30.) However, at the hearing, Wilcoxon admitted that the deduction of capital gains taxes was an error since TONG is an S-corporation that does not owe entity-level taxes. Nevertheless, with an erroneous deduction for capital gains taxes, Wilcoxon determined that the fair market value of the members' equity in TONG as of February 11, 2020 was $3,877,725.00. (*Id*.)

38. Finally, Wilcoxon concluded that the hypothetical liquidation of Palm Park would trigger TONG's obligation to pay $798,539.00 to the CFCRU under a Profit Participation Plan between TONG and CFCRU (the "Participation Plan," PHV Ex. 10). (*Id*. at pp. 29–30, and 32.) The Participation Plan provides for TONG to make a payment of 15% of "the total Outstanding Equity in TONG" to the trust in

---

[6] In his report, Wilcoxon also labels the $5,151,867.00 figure as the "Total Shareholder Equity" in Palm Park and as the "Total Liquidation Value of Palm Park Investment." (*Id*. at 28, 29.)

the event of a "Liquidating Event." (PHV Ex. 10, at p. 1.)  A "Liquidating Event" is defined as (1) any sale of a voting control interest in TONG resulting in a change of control of TONG or (2) any sale of all or substantially all of the assets of TONG resulting in a dividend or distribution to the equity holders of TONG.  (*Id*.) Deducting the CFCRU payment, Wilcoxon determined that the fair market value of the members' equity in TONG was $3,079,000.00 (rounded), and that Horizon's 37.5% membership interest should be valued at $1,154,625.00.  (*Id*. at p. 32.)

39.     With this understanding of the positions of, and evidence presented by, Horizon and Oak Crest, the Court now turns to its determination of the fair value of Horizon's membership interest in TONG.

### III.     LEGAL STANDARDS AND ANALYSIS

40.     Under N.S.G.S. § 57D-6-03(d) of the North Carolina Limited Liability Company Act, this Court is tasked with determining the fair value of Horizon's membership interest in TONG.  Section 57D-6-03(d) provides as follows:

> In any proceeding brought by a member under clause (ii) of G.S. 57D-6-02(2) in which the court determines that dissolution is necessary, the court will not order dissolution if after the court's decision the LLC or one or more other members elect to purchase the ownership interest of the complaining member at its fair value in accordance with any procedures the court may provide.

41.     There exists no case authority on the standards for applying this statute.  However, interpreting the nearly identical language in section 55-14-31(d) of the North Carolina Business Corporation Act[7], this Court held that "[t]he term

---

[7] Section 55-14-31(d) provides:

'fair value' is not defined" in that statute "nor does the statute provide any specific guidance with respect to the factors to be used in determining fair value." *Royals v. Piedmont Elec. Repair Co.,* 1999 NCBC LEXIS 1, at *52 (N.C. Super. Ct. Mar. 3, 1999), *aff'd* 137 N.C. App. 700, 529 S.E.2d 515 (2000). The language of the statute simply requires that fair value be "determined in accordance with such procedures as the court may provide." N.C.G.S. § 55-14-31(d); *Vernon v. Cuomo,* 2010 NCBC LEXIS 7, at *7 (N.C. Super. Ct. Mar. 15, 1999).

42.     This Court also has recognized that:

> The Legislature wisely provided for flexibility in determining fair value. Recognizing that every situation will be different, the Legislature did not limit fair value to market value and did not place any limiting parameters on the factors to be considered in determining fair value. It recognized that the value of ownership in a small, closely held company could differ markedly from market value. In taking away the court's ability to provide equitable relief, it did not intend for the court to ignore equitable considerations in setting fair value. The statutory scheme protects both minority and majority shareholders by providing that the minority can be forced to sell at a fair price considering all the circumstances and the majority can elect to pay that price or dissolve the company.

*Garlock v. Southeastern Gas & Power, Inc.*, 2001 NCBC LEXIS 9, at *36-37 (N.C. Super. Ct. Nov. 14, 2001). In addition, "the procedure for determining fair value was

---

> In any proceeding brought by a shareholder under G.S. 55-14-30(2)(ii) in which the court determines that dissolution would be appropriate, the court shall not order dissolution if, after such determination, the corporation elects to purchase the shares of the complaining shareholder at their fair value, as determined in accordance with such procedures as the court may provide.

left to the Court's discretion. The broader definition and flexibility in procedure recognize that the circumstances surrounding the provision of equitable relief in the form of dissolution can vary widely. Business conditions can vary depending on the nature of the business." *Royals*, 1999 NCBC LEXIS 1, at *35.

43. In deciding the fair value of the stock shares at issue in *Royals,* the Court considered the following factors: (a) the market value of the business, including any independent appraiser's valuation report, (b) whether there should be discounts for lack of control and marketability, (c) the objections to the valuation raised by the parties, and (d) other factors affecting fair value determination, including equitable considerations, changes in condition from the date of the valuation, and practical considerations. 1999 NCBC LEXIS 1, at *34–45; *see also Garlock*, 2001 NCBC LEXIS 9, at *36–37 (using *Royals* factors to determine fair value). The Court will consider these factors in determining the fair value of Horizon's membership interest in TONG.

44. Preliminarily, the Court notes that the Parties contend that an asset-based approach should be used to determine the fair value of Horizon's interest in TONG. The Parties agree that Palm Park is a real estate holding company. They also agree that TONG is a holding company, although Horizon argues that TONG is a real estate holding company and Oak Crest argues TONG is an investment holding company. It is undisputed that TONG has no employees and no business operations, and that it exists solely to own Palm Park. *See Estate of Levenson v. Commissioner*, 282 F.2d 581, 586 (3rd Cir. 1960) (highlighting that "primary consideration is

generally given to earnings in valuing operating companies while the greatest weight is given to the consideration of assets in valuing securities underlying the holding type of company"); *Griffin Mgmt. Corp. v. Carolina Power & Light Co.*, 2009 NCBC LEXIS 28, at \*5 (N.C. Super. Nov. 12, 2009) (identifying entity as "passive holding company" where it "does not conduct business as an operating entity" and "the sole responsibility of its officers is to manage the company's ownership interests in its subsidiary entities"). Furthermore, neither TONG nor Palm Park employees manage the Properties. Instead, Palm Park has contracted the management to Colliers. No evidence presented at trial or at the Hearing established that TONG or Palm Park is actively engaged in seeking new real estate investment opportunities or has done so in many years. *See Estate of Ford*, 66 T.C.M. (CCH) 1507 (T.C. 1993), *aff'd*, 53 F.3d 924 (8th Cir. 1995) ("Where a corporation's assets consist of real estate, earnings are considered important where the corporation actively engages in a real estate management business. Where a corporation simply holds assets for investment and does not have active business operations, we have approved use of net asset value as a basis for valuing stock." (citations omitted)).

45.     The Parties also contend that IRS Revenue Ruling 59-60 provides the appropriate guidance for determining the market value of TONG. Revenue Ruling 59-50 provides, in pertinent part, as follows:

> The value of the stock of a closely held investment or real estate holding company, whether or not family owned, is closely related to the value of the assets underlying the stock. For companies of this type the appraiser should determine the fair market values of the assets of the company. Operating expenses of such a company and the

cost of liquidating it, if any, merit consideration when appraising the relative values of the stock and the underlying assets. The market values of the underlying assets give due weight to potential earnings and dividends of the particular items of property underlying the stock, capitalized at rates deemed proper by the investing public at the date of appraisal. A current appraisal by the investing public should be superior to the retrospective opinion of an individual. For these reasons, adjusted net worth should be accorded greater weight in valuing the stock of a closely held investment or real estate holding company, whether or not family owned, than any of the other customary yardsticks of appraisal, such as earnings and dividend paying capacity.

Rev. Rul. 59-60, 1959-1 C.B. 237 (1959) (emphasis added) (hereinafter "Rev. Rul. 59-60").

46.     Though it was developed for gift and estate tax valuations, "Revenue Ruling 59-60 still remains the focal point for the proper method of valuing closely-held securities." *Estate of Jelke v. Comm'r*, 507 F.3d 1317, 1321 (11th Cir. 2007); *see also J & M Distrib., Inc. v. Hearth & Home Techs., Inc.*, No. 13-CV-72 SRN/TNL, 2015 U.S. Dist. LEXIS 2314, at *10 (D. Minn. Jan. 9, 2015) ("It appears, however, that Revenue Ruling 59–60's general guidelines for evaluating closely-held corporations have been used in a variety of contexts—not merely in the estate and gift tax context.").

47.     For the same reasons as discussed in the above-cited cases, the Court concludes that an asset-based approach, and particularly the net asset approach proposed by the Parties, is the proper method for determining the fair market value of TONG.  Accordingly, the Court will now review the net asset approaches applied by the respective Parties to the valuation of Horizon's interest in TONG, including

Oak Crest's objections to the Leatherman reports and Horizon's objections to Wilcoxon's report, the applicability of market discounts, and other appropriate considerations, including the equities.

   A.    *Market value and objections to valuation raised by the Parties*

48.    Fair market value (or "market value") is defined as "the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts." Rev. Rul. 59-60; *Dep't of Transp. v. Adams Outdoor Advert. of Charlotte Ltd. P'ship*, 370 N.C. 101, 107, 804 S.E.2d 486, 493 (2017) (defining fair market value as "the price to which a willing buyer and a willing seller would agree."). "Market value is not the sole determinant of fair value but is a factor to be given heavy weight. It is the starting point for any valuation." *Royals*, 1999 NCBC LEXIS 1, at \*35. "Depending on the circumstances, 'fair value' of a minority interest could be greater than 'market value' or could be less. Each situation represents a unique set of facts for valuation purposes." *Royals*, 1999 NCBC LEXIS 1, at \*41.

49.    In this case, the Court is presented with expert evidence regarding (a) the appraised values of the Properties as provided in the June 18 Reports and July 9 Reports prepared by Leatherman, the Parties' joint expert appraiser, and (b) the fair market value of Horizon's membership interest in TONG as provided by Defendants' expert in the Wilcoxon Valuation Report. However, while the June 18 and July 9 Reports are important evidence to be considered, Wilcoxon's Valuation

Report is the *only* expert evidence in the record regarding the fair market value of Horizon's interest in TONG, the factor this Court considers under the *Royals* approach to deciding fair value. Nevertheless, since the June 18 Reports and July 9 Reports are a significant component of Wilcoxon's valuation of Horizon's interest in TONG, the Court will first consider the appraised values of the Properties provided by Leatherman's reports, and then the fair market value of Horizon's interest in TONG provided in the Wilcoxon Valuation Report.

50.     Oak Crest objects to the appraised valuations in the July 9 Reports based on Leatherman's unexplained changes to several critical capitalization and inflation assumptions used in the June 18 Reports. If Leatherman had simply corrected the errors in the June 18 Reports and used the same capitalization and inflation rate assumptions, the aggregate appraised values of Properties would decrease from $11,615,000.00 to $9,516,000.00. However, taking what appears to be a "results oriented" approach in order to reach the same appraised value conclusions as in the June 18 Reports, in the July 9 Reports Leatherman changed certain assumptions underlying his calculations. He also determined the values for the 1135 Kildaire Farm Road and the 3221 Durham Drive properties by averaging the sales comparison and discounted cash flow values instead of using only the discounted cash flow value as he had done in the June 18 Reports. With these changes in assumptions and methodology, the aggregate appraised value of the Properties in the July 9 Reports is $11,625,000.00, or within 1% of Leatherman's original

valuation. In the July 9 Reports, he provides no explanation or support for the changes in his underlying assumptions or methodology.

51. Like Oak Crest, the Court finds the valuations provided by the July 9 Reports suspect. The nearly identical aggregate appraised value for the Properties in the July 9 Reports, despite correcting for significant errors in the June 18 Reports, leads the Court to conclude that, for some reason, Leatherman was attempting to justify the values reached in the June 18 Reports. However, he did so without providing a sound basis for the changes in his assumptions and methodology. The Court concludes, in its discretion, that it cannot rely solely on the appraisal contained in the July 9 Reports in determining the fair market value of the Properties.

52. Nevertheless, there is no dispute that Leatherman is a highly experienced and respected appraiser and his overall appraisal methodology and data sources are accepted and relied upon by professionals in performing commercial real estate appraisals. Therefore, certain information contained in the two Leatherman reports can be salvaged and used in assisting the Court to reach a conclusion on the market value of the Properties. For example, Wilcoxon does not take issue with the valuations reached by Leatherman using the sales comparison approach, nor with the corrected calculations of Leatherman's discounted cash flow or direct capitalization values (before Leatherman's changes to his assumptions in the July 9 Reports). To the contrary, in the Wilcoxon Valuation Report, Wilcoxon uses Leatherman's corrected appraised values and his averaging methodology

(substituting the direct capitalization values for the discounted cash flow values) for the 1135 Kildaire Farm Road and 3221 Durham Drive properties, and uses Leatherman's direct capitalization value for the 527 E. Chatham Street property. Wilcoxon's methodology results in his determination that the aggregate appraised value of the Properties should be $10,407,500.00, approximately the mid-way point between Leatherman's aggregate appraised valuation of the Properties in the June 18 Reports and the corrected aggregate valuations applying Leatherman's original inflation and capitalization rate assumptions.[8]

53.     Therefore, the Court finds that the appraised value of the Properties for purposes of determining the fair market value of Horizon's membership interest in TONG is $10,407,500.00.

54.     The Court next considers Wilcoxon's Valuation Report. Wilcoxon reached his determination of the fair market value of Horizon's interest in TONG using a net asset approach and premised on an orderly liquidation of TONG, including the sale of the Properties by Palm Park.  As part of valuing Horizon's interest using the orderly liquidation premise, Wilcoxon deducted from the net asset value of TONG the capital gains taxes on the associated transactions, the costs of sale for selling the Properties, and the profit participation payment by TONG.

55.     Horizon objects to the use of the orderly liquidation premise.  Horizon argues that "the premise underlying Defendants' entire methodology is that TONG, Palm Park, and all assets are immediately liquidated, and all liabilities are

---

[8] Leatherman June 18 Reports' aggregate appraised value ($11,615,000.00) + corrected aggregate appraised value ($9,516,000.00) ÷ 2 = $10,565,500.00.

accelerated to the present." (ECF No. 177, at p. 2.) Horizon contends that under N.C.G.S. § 57D-6-03(d), Oak Crest elected to purchase Horizon's membership interest *instead of* having TONG liquidated, and in order "to allow Defendants to continue enjoying the long-term benefits of investment in" TONG and Palm Park "as a going concern." (*Id.* at p. 3.) Horizon argues that there is no evidence that Oak Crest intends to liquidate TONG such that valuation based on a hypothetical liquidation could be supported. Instead, such a liquidation is purely speculative and hypothetical. (ECF No. 177, at pp. 5–7.) Therefore, Horizon argues, since there is no evidence of an imminent or likely liquidation, it is improper to deduct the capital gains taxes, costs of sale, and the profit participation payment in valuing Horizon's interest in TONG. (*Id.* at pp. 1–15.)

56. The Court must first consider the nature of Horizon's objection, which is not squarely aimed at Wilcoxon's determination of the fair market value of Horizon's interest. Rather, Horizon objects to the Court giving Wilcoxon's fair market value conclusion any weight. In other words, Horizon's argument is that the Court should disregard Wilcoxon's valuation in deciding the fair value of Horizon's interest in TONG. But the question at hand is simply whether Wilcoxon's Valuation Report is evidence of the fair market value of Horizon's interest in TONG. On this question, the Court concludes that Horizon's position that Wilcoxon's Valuation Report should be disregarded is unpersuasive.

57. First, there is no dispute that the orderly liquidation premise is an accepted method for determining the fair market value of holding companies. In

fact, Revenue Ruling 59-60, which both Parties rely on, expressly provides that when deciding the market value of a holding company "the cost of liquidating it, if any, merit consideration when appraising the relative values of the stock and the underlying assets." Rev. Rul. 59-60.

58. Second, fair market value is based on determining the price a hypothetical willing buyer and seller would settle upon for the membership interest at issue, and is not determined by deciding the price that would be arrived at by the specific buyer and seller involved in the particular transaction under consideration. *Estate of Jameson v. Comm'r*, 267 F.3d 366, 371-372 (5th Cir. 2001) ("The buyer and seller are hypothetical, not actual persons, and each is a rational economic actor, that is, each seeks to maximize his advantage in the context of the market that exists at the date of valuation . . . Fair market value analysis depends [ ] on a hypothetical rather than an actual buyer," and cannot be determined based on assumption that buyer would continue to operate the business rather than liquidate.) Under a net asset valuation, the costs associated with liquidating the underlying assets would be considered by a willing buyer and factored into the price the buyer pays for the asset. *Dunn v. Comm'r*, 301 F.3d 339, 352-353 (5th Cir. 2002); *see also Estate of Jelke v. Comm'r*, 507 F.3d 1317, 1324-1333 (11th Cir. 2007) (and cases cited therein). In *Dunn*, the Court of Appeals reversed the U.S. Tax Court's decision that the estate tax value of a decedent's interest in the stock of Dunn Equipment, Inc. ("Dunn Equipment") should be reduced by the capital gains taxes that would be generated

by the liquidation of Dunn Equipment because the Court concluded that there was a low "likelihood of liquidation." The Court held:

> The Tax Court made a more significant mistake in the way it factored the "likelihood of liquidation" into its methodology, a quintessential mixing of apples and oranges: considering the likelihood of a liquidation sale of assets when calculating the asset-based value of the Corporation. Under the factual totality of this case, the hypothetical assumption that the assets will be sold is a foregone conclusion -- a given -- for purposes of the asset-based test. The process of determining the value of the assets for this facet of the asset-based valuation methodology must start with the basic assumption that all assets will be sold, either by Dunn Equipment to the willing buyer or by the willing buyer of the Decedent's block of stock after he acquires her stock. By definition, the asset-based value of a corporation is grounded in the fair market value of its assets (a figure found by the Tax Court and not contested by the estate), which in turn is determined by applying the venerable willing buyer-willing seller test. By its very definition, this contemplates the consummation of the purchase and sale of the property, i.e., the asset being valued. Otherwise the hypothetical willing parties would be called something other than "buyer" and "seller."
>
> In other words, when one facet of the valuation process requires a sub-determination based on the value of the company's assets, that value must be tested in the same willing buyer/willing seller crucible as is the stock itself, which presupposes that the property being valued is in fact bought and sold. It is axiomatic that an asset-based valuation starts with the gross market (sales) value of the underlying assets themselves, . . .

301 F.3d at 353.

59.     Horizon's argument that the Court should not consider Wilcoxon's valuation because there is no evidence that Oak Crest intends to liquidate TONG is flawed for the same reasons summarized in *Dunn* — a fair market valuation

presumes a hypothetical buyer who would take into account the costs of liquidation, including capital gains taxes, in the price the buyer would pay for the assets. The Court concludes that the likelihood of liquidation is not a proper consideration in determining the fair market value of Horizon's membership interest in TONG and is not a basis for refusing to consider Wilcoxon's Valuation Report.

60. Horizon argues that the *fair value* of TONG should be determined on a "going concern" basis, in the same fashion as it would be determined for dissenting shareholders exercising statutory appraisal rights. (ECF No. 177, at pp. 3–4.) However, as explained in *Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549 (Del. 2000), a case Horizon cites in support of its argument, Horizon's position is inapposite to its contention that a net asset valuation is the appropriate means of determining the value of its interest in TONG. *Id.* at 554 ("[B]ecause 'the value of dissenting stock is to be fixed on a going concern basis, the taking of the net asset value as the appraisal value of the stock is obviously precluded by the [going-concern] rule'" quoting *Tri-Continental Corp. v. Battye*, 74 A.2d 71, 74 (Del. 1950) ("This is so because, primarily, net asset value is a theoretical liquidating value to which the share would be entitled upon the company going out of business. Its very nature indicates that it is not the value of stock in a going concern.")).[9]

---

[9] *Reynolds Am. Inc. v. Third Motion Equities Master Fund Ltd.*, 2020 NCBC LEXIS 56, *173 (N.C. Super. Ct. April 27, 2020) ("Although Delaware's appraisal statute, . . ., is not identical to [North Carolina's appraisal statute], the two statutes each require a determination of 'fair value' and are sufficiently similar that the Court finds decisions of the Delaware courts under [the Delaware statute], although not binding, to be helpful guidance in interpreting the North Carolina appraisal statute.").

61. Horizon also argues the North Carolina courts, in the context of valuing marital property, have held that considering tax consequences and other associated costs of a sale is improper where there is no evidence that a sale of the asset is imminent or inevitable. (*See Id*. at pp. 5–6 and 8–9 and cases cited therein.) The Court concludes that the facts involved in the cases cited by Horizon are distinguishable from the facts in this case, primarily on the grounds that the cases involved courts' determinations of the value of marital property under North Carolina's equitable distribution statute, and none of these cases addressed whether deductions for liquidation costs and taxes were proper in making a fair market value calculation.

62. Horizon also argues that Wilcoxon's deduction of $723,359.00 from TONG's value to account for the profit participation payment to the CFCRU based on the hypothetical sale of Palm Park is improper. (*Id*. at p. 10.) Horizon argues that the sale of its minority interest in TONG back to Oak Crest results in neither a sale of substantially all of TONG's assets, nor a change in control of TONG, which Oak Crest will continue to control. Again, Horizon argues that the payment based on a hypothetical event should not be considered in determining the fair market value of TONG. (*Id*.)

63. Finally, Horizon argues that it would be inequitable to permit Defendants to engage in conduct causing the Court to order liquidation, then elect not to liquidate TONG and instead purchase Horizon's interest, while at the same

time reaping the advantages of having TONG valued based on a hypothetical orderly liquidation. (*Id.*, at pp. 7–9.)

64. The Court concludes that Horizon's additional arguments suffer from the same flaw as its argument that the Court should wholly disregard Wilcoxon's conclusion as to fair market value because it is based on an orderly liquidation premise. The arguments do not challenge the valuation Wilcoxon reached using this methodology, but rather are directed at the weight to be given his conclusions under the specific facts present in this case. Again, the Court is not persuaded that Wilcoxon's Valuation Report is not competent evidence of the fair market value of Horizon's interest in TONG, and therefore should not be considered by this Court.

65. The Court has thoroughly reviewed Horizon's objections to Wilcoxon's Valuation Report and finds and concludes that the report provides competent evidence of the fair market value of Horizon's membership interest in TONG that should be considered under a *Royals* analysis. However, the Court also concludes that it must make corrections to the value provided by the Wilcoxon's Valuation Report for (a) Wilcoxon's admitted error in deducting $184,551.00 for capital gains taxes that TONG would pay upon the liquidation of TONG, and (b) other adjustments to his valuation of Horizon's interest in TONG in the amount of approximately $22,000.00 that Wilcoxon admitted were appropriate based on his erroneous use of certain other amounts in his calculation. Accounting for these adjustments, the Court finds that Wilcoxon's Valuation Report should reflect a fair market value of $1,245,732.62 for Horizon's interest. The Court further recognizes

that, unlike in the *Royals* and *Garlock* cases, the evidence of fair market value was provided by Oak Crest's business valuation expert witness, and not by an independent valuation expert. Therefore, the Court finds Wilcoxon to be less credible and reliable, and have less weight, than it would an independent business valuation expert, and will give appropriate consideration to that fact in reaching its determination as to fair value.

66. The Court next turns to Horizon's proposed non-expert calculation of the fair value of Horizon's membership interest. Horizon contends that TONG's total assets can be calculated by simply adding Palm Park's stipulated cash assets (with Horizon's minor downward adjustment) and the receivable owed to Palm Park for the advancements to the Byelicks to the appraised value of the Properties. Horizon then subtracts Palm Park's stipulated mortgage and other debts to arrive at Palm Park's net asset value. Since Horizon does not seek the unexplained stipulated TONG asset worth $30,000.00, it contends that Palm Park's net asset value equals the total value of TONG's assets. (ECF No. 177, at p. 16.)

67. Horizon next subtracts from TONG's assets the stipulated balances owed on the promissory note due to CFCRU and the promissory note due to the Cannon Family Trust. Horizon does not subtract from TONG's assets the amount of the profit participation payment due to the CFCRU upon liquidation of TONG's assets. Horizon's calculation results in TONG's total net asset value being

$8,071,546.09. (*Id*. at p. 17.) Based on these calculations, Horizon contends that its 37.5% interest should be valued at $3,026,830.01. (*Id*.)[10]

68. The Court finds and concludes that Horizon's proposed method for calculating the value of Horizon's interest in TONG is entitled to some, but relatively little, weight in determining fair value in this case. Horizon does not argue that its simple net asset calculation is a methodology accepted or used by business valuation professionals in calculating fair market value. Instead, it contends that this is a method that is sometimes used by commercial real estate brokers as a means of determining value when advising clients regarding the sale or purchase of commercial real estate. While the Court will give Horizon's proposed value of its interest in TONG appropriate consideration, it will proceed to determine fair value using Wilcoxon's fair market value conclusion as its starting point. *Royals*, 1999 NCBC LEXIS 1, at *35 (While "market value is not the sole determinant of fair value . . . [it] is a factor to be given heavy weight. It is the starting point for any valuation.").

69. The Court must now consider the remaining *Royals* factors and any impact they may have on the fair value of Horizon's membership interest in TONG.

*B. Other factors affecting fair value determination, including equitable considerations*

---

[10] The Court calculated the value of Horizon's membership interest using Horizon's methodology but substituted the Court's approved appraisal value of the Properties of $10,407,500.00 instead of Horizon's figure of $11,695,000.00. This calculation results in Horizon's 37.5% interest being valued at $2,501,623.53. The Court will use this adjusted figure, and not the $3,026,830.01 proposed by Horizon, for purposes of considering Horizon's proposed fair valuation of its membership interest in TONG.

70.    As a preliminary matter, the Court concludes that some of the factors considered by the Court in *Royals* have no significant impact on the question of fair value in this matter.   First, the Parties agree that the Court should not apply discounts for the lack of marketability or lack of control of Horizon's membership interest in TONG in determining fair value.  The Court agrees.  Since the Court has found that dissolution of TONG is appropriate, "it would be inequitable to then value the minority [membership interest] by giving them less than the full value they would have if the company were sold and they received their pro rata share of the total sales price. To do otherwise would provide a reward to majority [members] who oppressed minority [members] or chose to run the company for their own benefit without regard to the interests of minority [members]." *Royals*, 1999 NCBC LEXIS 1, at *38.   The jury concluded that the Byelicks engaged in self-interested transactions and violated fiduciary duties to Horizon, leading the Court to conclude that dissolution of TONG was necessary in order to protect Horizon's interest. "North Carolina law does not favor application of discounts for lack of control or lack of marketability under these circumstances." *Id*. at *38.  The Court concludes, in its discretion, that the value of Horizon's membership interest should not be adjusted for lack of marketability or control.

71.    The Parties presented no evidence and did not argue that there has been a change of circumstances since February 11, 2020 that the Court must consider in deciding the fair value of Horizon's membership interest.   To the contrary, there is no evidence suggesting that Oak Crest and the Byelicks will not

operate TONG and Palm Park in the same manner as they have operated them over the past several years once Oak Crest acquires Horizon's membership interest in TONG. The Court concludes, in its discretion, that the value of Horizon's membership interest should not be adjusted for changed circumstances.

72. The equities in this matter present the Court with something of a conundrum. The jury found that the Byelicks engaged in breaches of fiduciary duties, and the Court concluded those breaches frustrated Horizon's expectations, leading the Court to conclude that dissolution of TONG was necessary. Section 57D-6-03(d) provides the company or other members the right to purchase the interest of the complaining member instead of having the company dissolved. Oak Crest chose to buy Horizon's interest in TONG to avoid liquidation of TONG. Horizon argues, under the facts present in this case and based on the structure of N.C.G.S. § 57D-6-03(d), that it would be inequitable to permit Oak Crest to get the benefit of valuing Horizon's interest based on a hypothetical dissolution.

73. The Court already concluded that Horizon's argument has no impact on the weight to be given to Wilcoxon's determination of the fair market value of Horizon's interest because fair market value assumes a hypothetical buyer and seller and not the circumstances under which the actual buyer and seller involved in the transaction find themselves. However, this does not necessarily mean that the Court cannot consider the specific circumstances involved in this case in assessing the equities. The discretion provided the Court by the statute leaves it with vast authority to consider any factors it deems relevant to deciding the fair value of a

member's interest in a limited liability company. "Each situation represents a unique set of facts for valuation purposes. The equitable nature of relief requested by the complaining shareholders requires flexibility, and the statute provides that flexibility." *Royals*, 1999 NCBC LEXIS 1, at \*41; *Garlock*, 2001 NCBC LEXIS 9, at \*36 ("The Legislature wisely provided for flexibility in determining fair value . . . and did not place any limiting parameters on the factors to be considered in determining fair value."). Therefore, the Court finds and concludes that it may consider the fact that an actual dissolution will not occur in this case in applying its equitable discretion to deciding the fair value of Horizon's interest.

74. Finally, the Court considers the practical considerations that influence the determination of fair value in this case. This Court has held that:

> A fair price is not one which automatically results in dissolution. The funds for purchasing the minority shareholder' interests must come from borrowed funds or operation expenses. Each alternative affects the future profitability of the company and its ability to function. If the "market valuation" results in a price that makes purchase impractical or impossible, the Court should take that into consideration.

*Garlock*, 2001 NCBC Lexis 9, at \*47 (quoting *Royals*, 1999 NCBC Lexis 1, at \*44).

75. The Court notes that the evidence presented at the trial of this matter, including extensive financial reporting regarding the Properties, emails and communications over the last few years between the Parties as they attempted to resolve their differences over operations of TONG and Palm Park, and the testimony of individuals involved in the day-to-day operations of the Properties and Palm Park, painted a picture of a company that faces significant challenges to attaining financial

success. While Plaintiffs undoubtedly would place blame for this solely at the feet of Defendants' management, the reality is more complicated. For example, the 1135 Kildaire Farm Road property has faced challenges over the past several years due to the condition of the building and configuration of much of its available office space. The building was constructed in 1988, and the evidence indicated that it needs some maintenance, repairs, and upgrades to maximize its potential. Palm Park has had difficulty attracting new tenants to the property in recent years, particularly with regard to certain office space configured as shared office suites. The evidence at trial was that the market for shared office suite space has declined significantly during and since the Great Recession. Some of the office space in the building is currently being rented at what Horizon contends is sub-market rent. While the building generates a steady rental income, it is not currently generating any substantial profits.

76. In addition, the 1135 Kildaire Farm Road and 3221 Durham Drive properties are encumbered with substantial mortgage debt. It is questionable whether, or under what conditions, Oak Crest or the Byelicks would be able to obtain additional financing that will be needed to purchase Horizon's interest. These are factors that the Court should consider in determining the final fair value of that interest. *Garlock*, 2001 NCBC Lexis 9, at \*47–48 (finding potential problems with obtaining bank financing to pay for purchase of minority shareholders' interests and company's liquidation value relevant in determining fair value of shares).

77.    In addition, the evidence at trial showed that Palm Park provides a livelihood for the Byelicks and at least one or two other individuals.  It would be a sad end to the unfortunate story underlying this case if Oak Crest's purchase of Horizon's membership interest jeopardized the continued existence of Palm Park.

78.    Based on these considerations, as well as wishing to place the Parties in the best position possible to be able to quickly close a purchase transaction, close out this lawsuit, and proceed with their respective business lives, the Court, in its discretion, concludes that the fair value of Horizon's membership interest in TONG is $1,650,000.00.

79.    Therefore, having considered the appraisals provided in the June 18 Reports and July 9 Reports, the Wilcoxon's Valuation Report, Horizon's proposed fair valuation adjusted to account for the appraised value of the Properties used by the Court, the testimony and exhibits admitted at the Hearing and, as relevant, at the trial, and the factors set forth above, the Court finds as a fact and concludes as a matter of law that the fair value of Horizon's membership interest for purposes of the rights and remedies provided by N.C.G.S. § 57D-6-03(d), is $1,650,000.00.

80.    The Court further concludes that under the statute and its inherent equitable powers, it has authority to set the terms under which Horizon's membership interest is purchased.  *Royals*, 1999 NCBC LEXIS 1, at *45; *Garlock*, 2001 NCBC LEXIS 9, at * 48–49.  However, the Court prefers that the Parties agree on the terms under which Horizon's interest will be purchased, if that is possible, before imposing terms on them.  Accordingly, the Court, in its discretion, will provide

the Parties with up to thirty (30) days from the date of this Order to confer and attempt to agree on the terms for the purchase of Horizon's membership interest, with consideration given to the terms set by the Court in *Royals*, including provisions for a potential change in ownership or control of TONG or its assets. The terms of such agreement shall be subject to approval by the Court. If the Parties are unable to come to an agreement, the Court shall issue an order setting the terms for the purchase of Horizon's membership interest in TONG.

THEREFORE, it is ORDERED that:

1. The fair value of Horizon's 37.5% membership interest in TONG is $1,650,000.00.

2. The Parties shall, on or before thirty (30) days from the date of this Order, confer and attempt to agree on the terms for the purchase of Horizon's membership interest, with consideration given to the terms set by the Court in *Royals*, including provisions for a potential change in ownership or control of TONG or its assets. On or before thirty (30) days from the date of this Order, the Parties shall file with the Court a notice regarding whether they have reached agreement on the terms for the purchase of Horizon's membership interest and, if so, setting forth the terms of the agreement.

3. If the Parties are unable to come to an agreement, the Court shall issue an order setting the terms for the purchase of Horizon's membership interest in TONG.

SO ORDERED, this the 18th day of November, 2020.


                                        /s/ Gregory P. McGuire
                                        Gregory P. McGuire
                                        Special Superior Court Judge
                                        for Complex Business Cases